1

**STREAM KIM HICKS WRAGE & ALFARO, PC**
EUGENE KIM, SBN: 221753

2

eugene.kim@streamkim.com
THEODORE STREAM, SBN: 138160

3

ted.stream@streamkim.com
3403 Tenth Street, Suite 700

4

Riverside CA, 92501
Telephone: (951) 783-9470

5

6

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Maxwell R. Huffman (SBN 264687)

7

600 W. Broadway, Suite 3300
San Diego, CA 92101

8

Telephone: 619-233-4565
Email: mhuffman@scott-scott.com

9

*Counsel for Plaintiff Iron Workers Local No. 55 Pension Fund*

10

[Additional counsel on signature page.]

11

12

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

13

14

IRON WORKERS LOCAL NO. 55
PENSION FUND, Derivatively on Behalf
of Nominal Defendant LIVE NATION
ENTERTAINMENT, INC.,

15

16

                    Plaintiff,

17

          v.

18

MICHAEL RAPINO, MAVERICK
CARTER, PING FU, JEFFREY T.
HINSON, CHAD HOLLINGSWORTH,
JAMES IOVINE, JAMES S. KAHAN,
GREGORY B. MAFFEI, RANDALL T.
MAYS, RICHARD A. PAUL, DANA
WALDEN, LATRIECE WATKINS, JOE
BERCHTOLD, BRIAN CAPO, JOHN
HOPMANS, and MICHAEL ROWLES,

19

20

21

22

23

                    Defendants,

24

          – and –

25

LIVE NATION ENTERTAINMENT,
INC.,

26

27

                    Nominal Defendant.

Civil Action No. 2:25-cv-5538-KK-ASx

**REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

28

---

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

FILED
CLERK, U.S. DISTRICT COURT

JUL - 3 2025

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

1

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................2

II.   PARTIES ..........................................................................14

    A. Plaintiff ......................................................................14

    B. Nominal Defendant.........................................................14

    C. Director Defendants .......................................................14

    D. Officer Defendants.........................................................21

    E. Relevant Non-Parties .....................................................22

III.  JURISDICTION AND VENUE .............................................23

IV.   SUBSTANTIVE ALLEGATIONS .........................................24

    A. Defendants Owe Fiduciary Duties to Oversee Live Nation's
       "Mission Critical" Compliance with U.S. Antitrust Laws. ........24

    B. Since their Formations, Live Nation and Ticketmaster Have
       Engaged in Anticompetitive Actions to Increase Their Companies'
       Respective Market Shares and Profits. ..................................25

    C. The Live Nation-Ticketmaster Merger Ends Competition Between
       the Two. .......................................................................27

    D. Live Nation Agrees to the 2010 Consent Decree to Merge
       Ticketmaster..................................................................30

    E. Despite the 2010 Consent Decree, Live Nation Continued Pursuing
       Anticompetitive Business Strategies to Increase its Profits and its
       Executive Compensation with the Board's Knowledge and Support. ......34

       1.   Live Nation used acquisitions, joint ventures, and other contractual
           agreements to stifle its competition while increasing its profits..........36

       a. AC Entertainment. ................................................................37

       b. United Concerts. ..................................................................38

       c. ScoreMore Shows..................................................................39

       d. Frank Productions and National Shows 2..............................41

       e. Red Mountain Entertainment...................................................43

       f. 313 Presents. ......................................................................44

       2.   Live Nation Colluded with OVG To Take Anticompetitive Actions..46

i

3.   Live Nation locked venues into exclusive long-term contracts to defeat
     competition while increasing Ticketmaster's sales................................50

4.   Live Nation required artists to hire Live Nation as their promoter to
     gain access to its numerous venues.......................................................57

F.   ██████████████████████████████████████████████
     ██████████████████████████.................................................59

G.   In December 2019, the DOJ Moved to Extend the 2010 Consent
     Decree for Another Five Years Citing Evidence that Live Nation
     Had Repeatedly Violated the Decree........................................................71

H.   From 2020 to the Present, Live Nation Continued Pursuing
     Unlawful Anticompetitive Business Strategies to Increase the
     Company's Profits and its Executive Compensation with the Board's
     Knowledge and Support. .........................................................................76

1.   Live Nation continued to acquire its competitors to increase its profits
     and market dominance with the Board taking no action to ensure those
     acquisitions complied with U.S. antitrust laws. .....................................77

2.   Live Nation continued to force venues, including large amphitheaters,
     into exclusive long-term contracts to stifle its competition, while also
     increasing Ticketmaster's sales...............................................................82

3.   Live Nation continued to threaten customers, rivals and potential
     competitors with OVG's assistance. .......................................................86

4.   Live Nation Continued to Increase its Control in the Secondary
     Ticketing Market Through its Anticompetitive Practices.......................96

I.   ██████████████████████████████████████████████
     ██████████████████████████.................................................98

J.   Live Nation Faces a Congressional Inquiry and DOJ Investigation
     Related to its Monopolistic Business Strategies.....................................105

K.   The Company's Profits Grow From 2022-2024 Due to Unlawful
     Anticompetitive Actions..........................................................................111

L.   Relying on Unlawful Anticompetitive Actions to Increase the
     Company's Profits in Turn Increased the Compensation of the
     Officer Defendants....................................................................................112

ii

V.   THE PROXY DEFENDANTS VIOLATED SECTION 14(A) OF THE
     EXCHANGE ACT AND SEC RULE 14A-9 BY CAUSING THE
     COMPANY TO FILE MATERIALLY FALSE OR MISLEADING
     PROXY STATEMENTS ............................................................................. 117

     A. The 2022 Proxy Defendants Caused Live Nation to Issue the
        Materially False or Misleading 2022 Proxy. ................................. 117

     B. The 2023 Proxy Defendants Caused Live Nation to Issue the
        Materially False or Misleading 2023 Proxy. ................................. 123

     C. The 2024 Proxy Defendants Caused Live Nation to Issue the
        Materially False or Misleading 2024 Proxy. ................................. 133

VI.  DEFENDANT RAPINO SOLD MORE THAN $250 MILLION IN
     LIVE NATION STOCK WHILE IN POSSESSION OF MATERIAL
     NONPUBLIC INFORMATION ................................................................. 142

VII. HARM TO LIVE NATION ....................................................................... 144

VIII.    DUTIES OF DEFENDANTS ............................................................... 147

     A. Fiduciary Duties Under Delaware Law. ........................................ 147

     B. The Board, its Committees, and Officers Were Charged with
        Overseeing Live Nation's Legal Compliance, Risk Exposure, and
        Internal Controls. ........................................................................... 148

     i.  Duties Under the Company's Certificate of Incorporation. ........ 149

     ii. Duties Under the Company's Code of Business Conduct and Ethics. . 149

         iii.    Duties of Audit Committee Members. ............................... 150

         iv.     Duties of Compensation Committee Members. ............... 151

IX.  DEMAND FUTILITY ............................................................................... 153

     A. Demand Is Futile for Count I Concerning Violations of Section
        14(a) of the Exchange Act. ............................................................ 153

     B. Demand Is Futile for Count II Concerning Breaches of Fiduciary
        Duty Alleged Against the Director Defendants. ............................ 155

         1.   A Majority of the Board Faces Substantial Liability for its Misconduct.
              ....................................................................................................... 156

         2.   A Majority of the Board Members Lack Independence from Each
              Other. ......................................................................................... 162

         a.   Hollingsworth and Vogel Are Not Independent Due to Their Liberty
              Media Ties. ................................................................................. 163

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

b.    Carter, Iovine, Paul, and Hinson Are Not Independent Because of
Their Personal Conflicts.................................................................... 165

C. Demand Is Futile for Count III Concerning Breaches of Fiduciary
Duty Alleged Against the Officer Defendants. ..................................... 168

D. Demand Is Futile for Count IV Concerning Insider Trading. ................. 169

X.    CLAIMS FOR RELIEF ................................................................................... 170

COUNT I......................................................................................................... 170

COUNT II ...................................................................................................... 173

COUNT III ..................................................................................................... 174

COUNT IV ..................................................................................................... 175

XI.  PRAYER FOR RELIEF ................................................................................. 176

XII. JURY DEMAND ............................................................................................ 178

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

Plaintiff, Iron Workers Local No. 55 Pension Fund ("Local 55" or "Plaintiff"), by and through its undersigned counsel, brings this action derivatively on behalf of Nominal Defendant Live Nation Entertainment, Inc. ("Live Nation" or the "Company"), against certain current and former members of Live Nation's Board of Directors (the "Board") and certain current named executive officers, seeking to remedy violations of the federal securities laws and insider trading laws as well as breaches of fiduciary duties. Plaintiff makes these allegations based on personal knowledge as to the facts of its ownership of Live Nation common stock and upon information and belief as to all other matters based on counsel's investigation, which included, among other things, a review of: (a) internal books and records obtained pursuant to a demand made under 8 *Del. C.* § 220 (2024) (the "Section 220 Documents"); (b) public filings by Live Nation with the U.S. Securities and Exchange Commission ("SEC"), including on Schedule 14A; (c) press releases and other publications disseminated by the Company and certain non-parties; (d) news articles, shareholder communications, and postings on Live Nation's website concerning the Company's public statements; (e) the proceedings in an action against Live Nation brought by the U.S. Department of Justice ("DOJ"), *United States v. Ticketmaster Ent., Inc.*, No. 1:10-cv-00139 (D.D.C.), which resulted in Live Nation entering into a consent decree (the "2010 Consent Decree") that imposed conditions on its merger with Ticketmaster Entertainment LLC ("Ticketmaster"),which was extended in 2020 after the DOJ found that Live Nation

1

had violated the consent decree's conditions (the "2020 Amended Judgment"); (f)

the proceedings in an antitrust enforcement action against Live Nation brought by

the DOJ and 40 states, *United States v. Live Nation Ent., Inc.*, No. 1:24-cv-03973

(S.D.N.Y.) (the "2024 DOJ Enforcement Action"); (g) proceedings in other lawsuits

and government proceedings involving Live Nation's anticompetitive business

strategies; and (h) other publicly available information concerning Live Nation and

Defendants.

## I.    INTRODUCTION

1.      In violation of the federal securities laws and in breach of their fiduciary

duties, Live Nation's officers and directors authorized and oversaw the Company's

pursuit of unlawful anticompetitive business strategies in the United States ("U.S.")

live entertainment market to increase Live Nation's profits, and in turn, the officers'

annual "at risk" compensation. By participating in, approving, and/or permitting

Live Nation's unlawful anticompetitive actions, Defendants acted in bad faith

related to the Company's compliance with U.S. antitrust law, including Sections 1

and 2 of the Sherman Act of 1890 (the "Sherman Act") and similar state antitrust

laws, and related consent decrees. Defendants further ignored red flags regarding the

Company's engagement in unlawful anticompetitive actions. Defendants also

violated the federal securities laws by making materially false and misleading

statements to the Company's stockholders in the Company's annual proxy

statements issued from 2022 through 2024 by omitting material information

2

regarding Live Nation's anticompetitive actions that exposed it to serious and significant regulatory and legal risks due to the Company's dominant position in the live entertainment market. A pre-suit litigation demand on the Board would be futile because a majority of the current Board members face a substantial likelihood of personal liability for: (1) violating the federal securities laws, (2) authorizing the Company to engage in unlawful anticompetitive conduct in order to increase profits and the officers' "at risk" annual compensation" (i.e., constituting a "*Massey*" claim under Delaware law), and/or (3) ignoring red flags regarding the Company's anticompetitive actions brought to their attention (i.e., a "Red Flags" claim under Delaware law). Plaintiff, accordingly, asserts these derivative claims on the Company's behalf to obtain a recovery for Live Nation due to the harm caused by Defendants' unlawful actions.

2.   As *The Wall Street Journal* recently explained in a video exposé regarding the Company's economics and business model, Live Nation is "the Most Powerful Company in the Concert Business." Live Nation describes itself as "the largest live entertainment company in the world," "the largest producer of live music concerts in the world," and "the world's leading live entertainment ticketing sales and marketing company." Live Nation operates in 51 countries; promotes over 54,000 events for approximately 11,000 artists; controls at least 394 venues around the world; and distributes over 637 million tickets through its subsidiary Ticketmaster. Live Nation's businesses touch every corner of the live entertainment

3

industry—live events promotions, primary ticketing, secondary ticketing, venue ownership and operations, music festivals, artist management, sponsorships, and more—and shape the experience of the industry's participants, including venues, artists, consumers, and competitors.

3.    The U.S. government and nineteen (19) state attorney generals recognized Live Nation's vast power and potential to stifle competition as early as 2010, when Live Nation and Ticketmaster sought to merge. This merger would bring together the U.S.'s largest concert promoter and the U.S.'s dominant ticketing business. The DOJ and the state attorney generals reviewed the proposed merger prior to its consummation. Specifically, these regulators found that the merger presented an instance of both horizontal and vertical integration—the companies were both "large players at different stages in the supply chain" within the live music industry and both provided primary ticketing services.

4.    This investigation led to a settlement, the 2010 Consent Decree, which sought to address the DOJ's horizontal integration concerns by imposing various structural requirements to safeguard competition in the primary ticketing market. The 2010 Consent Decree also included "behavioral remedies," which are restrictions on the future conduct of the combined company that are designed to prevent or mitigate anticompetitive behavior after the merger and were directed at the vertical integration concerns. Specifically, those remedies sought to "forbid the post-merger company from engaging in various forms of anticompetitive conduct,"

4

including retaliating against venues that consider or hire another primary ticketing service, creating "mandatory bundles" of services to condition access to Ticketmaster on hiring Live Nation for other services, and abusing Ticketmaster's ticket data to disadvantage competitors. The purpose of behavioral remedies is to aim to ensure that a company behaves in a way that maintains or promotes competition, even if it is not the most profitable course of action for the company.

5.     The 2010 Consent Decree was set to expire in 2020. However, in December 2019, the DOJ filed a petition seeking to clarify and extend the settlement by five and a half years because, "[d]espite the prohibitions in the [2010 Consent Decree], Live Nation repeatedly and over the course of several years engaged in conduct that, in the [DOJ]'s view, violated the [settlement]"—specifically, at least five major incidents occurred where Live Nation pressured concert venues to use Ticketmaster instead of other primary ticketing services. Live Nation agreed to the amendment and extension of the settlement, which the United States District Court for the District of Columbia entered in January 2020 (the 2020 Amended Judgment). The DOJ deemed this amendment "the most significant enforcement action of an existing antitrust decree by the Department in 20 years."

6.     Thus, for Live Nation, compliance with U.S. antitrust law is essential and mission critical for its business to remain in operation in its current business structure following the merger with Ticketmaster. As such, the Board was required to make a good faith effort to put in place a reasonable system of monitoring and

5

reporting about the Company's compliance with the U.S. antitrust laws. Moreover, the increased scrutiny from federal and state antitrust enforcers that Live Nation faced in 2010 and later in 2019 and 2020 were glaring red flags to the Board, and should have served as additional warnings to Live Nation's directors and officers, many of whom have been with the Company since the 2010 Live Nation-Ticketmaster merger, that compliance with U.S. antitrust obligations was mission critical to Live Nation's continued success as a combined company.

7.      Nonetheless, both before and after the entry of the 2020 Amended Judgment, Live Nation's directors and officers participated in, approved, and/or permitted Live Nation to engage in a slew of unlawful actions to suppress competition, which further increased the Company's power over and influence within the U.S. live entertainment industry, to reach aggressive short-term financial goals, and for which the officers received massive bonuses. Specifically, Live Nation's Board and officers caused the Company to engage in anticompetitive conduct including:

- acquiring or entering into joint ventures and other contractual agreements with potential competitors and nascent threats to neutralize any competition. In fact, internal documents revealed that Live Nation made acquisitions that were acknowledged internally as done for "defensive" reasons even when the financial numbers did not make sense.

- threatening and intimidating, directly or through intermediaries, rivals or potential threats, and otherwise

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

pressuring them, to blunt expansion into U.S. concert
promotions;

• colluding with a would-be competitor to avoid
competition in the concert promotions market;

• threatening and intimidating venues that considered
working with ticketers that were competitors;

• inducing venues to sign long-term exclusive ticketing
contracts that protect Ticketmaster;

• conditioning artists' access to Live Nation's large network
of amphitheaters and other venues on choosing Live
Nation as the promoter, enabling the Company to expand
its control over artists and third-party venues; and

• using these anticompetitive practices to increase Live
Nation's share of the sales made in Ticketing's secondary
markets.

8.      The Board further improperly incentivized Live Nation's five top
officers, Defendants Rapino, Berchtold, Hopmans, Rowles, and Capo, to engage in
these unlawful anticompetitive actions to increase their compensation. Specifically,
a large portion of their compensation, including large cash bonuses, are "at risk,"
which meant they were not fully paid unless the Company reached the Board's
Adjusted Operating Income ("AOI") targets. AOI is a non-GAAP financial measure
that the Board defines "as operating income (loss) before certain acquisition
expenses…, amortization of non-recoupable ticketing contract advances,
depreciation and amortization…, loss (gain) on disposal of operating assets, and
stock-based compensation expense."

7

1    9.    

8

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

10.     After years of the Board and its executives engaging in unlawful anticompetitive conduct, the extent and negative impact of Live Nation's domination of the U.S. ticketing market was exposed in November 2022 when Ticketmaster's systems crashed during the presale for Taylor Swift's extremely popular Eras Tour. The presale debacle resulted in a public outcry from both fans and regulators—just days later, it was reported that the DOJ was investigating the Company for antitrust violations, and that the Senate would hold a hearing "to examine the lack of competition in the ticketing industry."

11.     Live Nation now faces multiple lawsuits arising from the Company's misconduct in the U.S. For example, in January 2022, a putative class of consumers brought an antitrust action against Live Nation, alleging that the Company was engaging in various anticompetitive practices in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. *Heckman v. Live Nation Ent., Inc.*, No. 2:22-cv-00047 (C.D. Cal.) ("*Heckman*"). Specifically, the *Heckman* plaintiffs alleged that Live Nation "maintains its dominant position in the concert promotion services market by paying its clients exorbitant amounts, taking losses in this segment of the business in the 'tens of millions of dollars annually'" while subsidizing the activity "by Ticketmaster's supracompetitive profits." At the same time, "Live Nation threatens venues that if they do not use Ticketmaster as their primary ticketing service provider, Live Nation will limit the number of tours that go through the venue," which "limits the ability of Ticketmaster's competitors to compete in the

9

1    primary ticketing market and limits the options of venues." Consumers are harmed

2    by this system, which forces them to pay "supracompetitive fees that would not exist

3

4    in a competitive market."

5        12.    On April 11, 2025, Judge Kato issued a decision in *Heckman*, largely

6    denying Live Nation and Ticketmaster's motion to dismiss the consumer antitrust

7

8    class action's claims and finding that the plaintiffs adequately pled a "redressable

9    antitrust injury" to establish standing. Specifically, the court found that the plaintiffs

10   sufficiently alleged that Live Nation and Ticketmaster have:

11

12          (i) "conditioned the provision of concert promotion
            services on the use of primary ticketing services from
13          Ticketmaster,"

14          (ii) "conditioned the provision of primary ticketing
15          services on the use of secondary ticketing services from
            Ticketmaster,"
16

17          (iii) "use[d] their monopoly power in the primary
            ticketing market for major concert venues and concert
18          promotion services market to monopolize the market for
            secondary ticketing venues for major concert venues"
19          "through Ticketmaster's conditional license,"

20
            (iv) "agreed with and/or coerced ticket brokers and
21          other ticket resellers not to work with other secondary
            ticketing service providers,"
22

23          (v) "by building in and applying technological
24          limitations on primary ticket transferability . . . agreed
            with and/or coerced artists into preventing primary
25          ticket purchasers from working with other secondary
            ticketing service providers,
26

27

28

                                    10

(vi) induced and coerced venues to boycott Ticketmaster's competitors for the provision of primary ticketing services," and

(vii) "utilized exclusive dealing contracts with major concert venues, the conditional license, and technological limitations on primary ticket transferability to coerce resellers and artists to boycott other secondary ticket services providers."

13.    After finishing its investigation, on May 23, 2024, the DOJ, joined by forty (40) states, brought an antitrust lawsuit, *United States v. Live Nation Ent., Inc.*, No. 1:24-cv-03973 (S.D.N.Y.), against Live Nation based on the anticompetitive conduct alleged therein. On March 14, 2025, the Court denied Live Nation's motion to dismiss the complaint in that case on certain issues, while discovery was continuing to proceed on other claims.

14.    In March 2025, another consumer class action lawsuit, *Madrigal v. Ticketmaster LLC*, No. 2:25-cv-02375 (C.D. Cal.), was filed against Live Nation, alleging that the Company engages in deceptive practices by concealing the full price of tickets on the online ticket purchasing platform—conduct that only underscores Live Nation's reliance on unlawful practices and strategies and exposes the Company to liability.

15.    A securities fraud class action, *Donley v. Live Nation Ent., Inc.*, No. 2:23-cv-06343 (C.D. Cal.) (the "Securities Class Action"), was filed in August 2023, and recently announced a proposed settlement for $20 million. In denying the motion to dismiss, the *Donley* court found the plaintiffs had sufficiently alleged that the

11

defendants had made certain false and misleading statements by failing to disclose that Live Nation engaged in anticompetitive conduct, acknowledging the plaintiffs' allegation that Live Nation did not fully cooperate with investigations by the DOJ and Senate Subcommittee investigations, and was actually stonewalling the Subcommittee's efforts, in an attempt to hide the Company's undisclosed anticompetitive conduct.

16.    While the Board and the executives were allowing Live Nation to engage in these anticompetitive practices, Michael Rapino, the Company's long-term President, CEO, and Board member, capitalized on his knowledge of the Company's material nonpublic information concerning the Company's improper anticompetitive conduct, which included his own misconduct, to personally benefit, prior to reports starting in November 2022 that Live Nation was under investigation by the DOJ and the Senate Subcommittee for anticompetitive conduct. Specifically, starting in early 2022 and concluding in September 2022, Rapino sold a significant portion (i.e., over 90%) of his Live Nation shares for more than $250 million, further breaching his fiduciary duty to the Company. Now less than three years later, the Board has lavished Rapino with additional annual compensation, resulting in his ownership of 4,562,738 of vested and unvested shares of Live Nation stock as of April 25, 2025, worth over $600 million (nearly 2% of the Company's common stock).

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

17.    Certain directors also caused Live Nation to file proxy statements with the SEC from 2022 through 2024, which made false and misleading statements because they created a misleading impression of Live Nation's business that differed in a material way from the one actually existing related to the Company. In this regard, the proxies omitted material information regarding Live Nation's anticompetitive actions, along with its dominant role in the live entertainment market, which exposed the Company to serious and significant regulatory and legal risks. The proxy statements also created a misleading impression that Live Nation maintained internal controls and risk managements systems to ensure its compliance with U.S. antitrust law, when it did not. Those proxy statements further contained false and misleading statements claiming that Live Nation's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In truth, Live Nation's compensation design incentivized the Officer Defendants to engage in anticompetitive actions in violation of U.S. antitrust law and the consent decrees because a majority of the executives' compensation was "at risk" of being unpaid unless the Company's profits achieved the annual AOI targets set by the Board. Those false and misleading proxies further caused significant harm to Live Nation when its stockholders re-elected the Director Defendants, who continued to participate in the Company's wrongful anticompetitive conduct, and therefore, those claims are properly brought as derivative claims.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

18.    Accordingly, Plaintiff asserts this derivative action on Live Nation's behalf to hold its directors and officers liable for: (1) violations of Section 14(a) of the Exchange Act and the rules promulgated thereunder, (2) breaches of fiduciary duties, and (3) insider trading.

## II.    PARTIES

### A. Plaintiff

19.    Plaintiff, Iron Workers Local No. 55 Pension Fund (previously defined as "Local 55" or "Plaintiff"), is a defined benefit union pension fund based in Toledo, Ohio, that provides pension, retirement, disability, and death benefits to the members of Iron Workers Local No. 55 Pension Fund. Local 55 has been a stockholder of Live Nation at all times relevant to the claims asserted in this action.

### B. Nominal Defendant

20.    Nominal Defendant Live Nation Entertainment, Inc. (previously defined as "Live Nation" or the "Company") is a Delaware corporation with a principal place of business at 9348 Civic Center Drive, Beverly Hills, CA 90210.

### C. Director Defendants

21.    Defendant Michael Rapino ("Rapino") has served as Live Nation's President and Chief Executive Officer since 2005. He has also served on Live Nation's Board of Directors since 2005 and sits on the Board's Executive Committee. Since 2018, Rapino has been a director of Sirius XM Holdings Inc. ("Sirius XM"), a satellite radio company in which Liberty Media Corporation

14

("Liberty Media"), Live Nation's controlling shareholder, holds a majority stake. Defendant Gregory B. Maffei, Live Nation's Chairman and Liberty Media's President and CEO, is also Chairman of Sirius XM's Board of Directors. Live Nation "purchase[s] advertising on Sirius XM" "[f]rom time to time," and Sirius XM "also purchases sponsorship opportunities from [Live Nation]." Rapino sits on the board of Flipper's World, a roller-skating and fashion company co-founded by Defendant Jimmy Iovine's wife, and for which Iovine serves as an advisor. Rapino is also a board member of the SpringHill Company, a production company co-founded by Defendant Maverick Carter. Between 2021 and 2024, Rapino received over $176 million from Live Nation in compensation. From 2005 to 2024, Rapino was awarded over $392,027,056 from Live Nation in compensation as its CEO (i.e., $33,736,948 cash and $82,237,358 in stock awards). As of April 16, 2025, Rapino beneficially owned 3,517,139 shares of Live Nation common stock, worth $441,260,258.

22.     Defendant Gregory B. Maffei ("Maffei") was the Chairman of Live Nation's Board of Directors from 2013 to June 12, 2025, when he retired from the Board. He was a director from 2011 to June 12, 2025, and chaired the Board's Executive Committee. Maffei was the President and CEO of Liberty Media from May 2007 to December 31, 2024. He has also served as Chairman of Sirius XM's Board of Directors since April 2013 and a Director since March 2009, alongside Rapino. Maffei has served as a director and an executive of various other Liberty Media subsidiaries, including Liberty TripAdvisor Holdings, Inc., Liberty

15

Broadband Corporation, GCI Liberty, Inc., Pandora Media, Inc., Qurate Retail, Inc., and Charter Communications, Inc. He also served as a director of several companies in which Liberty Media previously held a controlling stake, including Starz, DirecTV, Barnes & Noble, Inc., and Atlanta Braves Holdings, Inc. From 2011 through 2024, Maffei received over $4,947,515 in compensation from Live Nation, including $1,231,250 in fees earned or paid in cash and $3,716,265 in stock awards. As of April 16, 2025, Maffei beneficially owned 107,583 shares of Live Nation common stock, worth $13,497,363.

23.    Defendant Maverick Carter ("Carter") has served on Live Nation's Board of Directors since 2018. He serves on the Board's Nominating and Corporate Governance Committee. He is the co-founder and CEO of LRMR Ventures, the "venture company that holds and oversees all of Carter's and LeBron James' current investments and business assets." LRMR Ventures invested in Beats by Dre, a company founded by Defendant Jimmy Iovine, another Live Nation director. Carter is a board member of Flipper's Roller Boogie Palace or Flipper's World, Carter is also the co-founder and CEO of The SpringHill Company, a "global consumer and entertainment brand spanning production, consumer products, consulting, and original content," in which Defendant Rich Paul, a fellow Live Nation director, has invested. Carter is a minority partner in Klutch, a talent agency owned by Paul. In 2022, Carter served as a board member of the Walmart Opportunity Leadership Council, while Live Nation director Defendant Latriece Watkins served as an

executive of Walmart U.S. Before joining the Live Nation Board of Directors, Carter "maintained friendships with" Live Nation directors Rapino, Paul, and Iovine, as well as with former Live Nation directors Dana Walden and Ari Emanuel. From 2018 to the present, Carter received over $1,681,361 in compensation from Live Nation, including $550,250 in fees earned or paid in cash and $942,749 in stock awards. As of April 16, 2025, Carter beneficially owned 15,898 shares of Live Nation common stock, worth $1,994,563.

24.   Defendant Ping Fu ("Fu") has been a Live Nation director since June 2018. She sits on the Board's Audit Committee. From 2018 to the present, Fu received over $1,904,761 in compensation from Live Nation, including $678,250 in fees earned or paid in cash and $1,226,511 in stock awards. As of April 16, 2025, Fu beneficially owned 13,013 shares of Live Nation common stock, worth $1,632,610.

25.   Defendant Jeffrey T. Hinson ("Hinson") has served on Live Nation's Board of Directors since 2005. He serves as Chair of the Board's Audit Committee. Hinson has been involved with multiple companies that have done or have sought business with Live Nation, including ParkHub (director), Sourced Craft Cocktails (investor and board member), AiBuy (consultant and has a "small option agreement"), Craft Standard (director and Chairman), and Ecliptic Capital, which has an ownership interest in Sourced Craft Cocktails (advisor "with a small interest in the fund"). From 2005 to the present, Hinson received over $4,831,571 in

17

compensation from Live Nation, including $2,024,375 in fees earned or paid in cash and $2,712,657 in stock awards. As of April 16, 2025, Hinson beneficially owned 50,509 shares of Live Nation common stock, worth $6,336,859.

26.    Defendant Chad Hollingsworth ("Hollingsworth") has been a Live Nation director since 2020, when he was nominated to replace Mark Carleton as one of Liberty Media's representatives on the Live Nation Board. He is the Chair of the Board's Compensation Committee. Since 2024, Hollingsworth has served as Senior Vice President, Corporate Strategy at Liberty Media. Before that, from 2016 to 2024, he was Senior Vice President, Corporate Development at Liberty Media. At Liberty Media, where he has worked since 2007, he "focuses on strategic growth initiatives within the Liberty portfolio, as well as supporting the generation and execution of investment opportunities within the sports and live entertainment sectors." From 2020 to the present, Hollingsworth received over $1,403,953 in compensation from Live Nation, including $486,250 in fees earned or paid in cash and $917,703 in stock awards. As of April 16, 2025, Hollingsworth beneficially owned 10,266 shares of Live Nation common stock, worth $1,287,972.

27.    Defendant Jimmy Iovine ("Iovine") has been a Live Nation director since 2014. He sits on the Board's Compensation Committee. Iovine co-founded music technology companies Beats Electronics, Beats Music, and Beats By Dre, in which Carter's LRMR Ventures invested. Iovine is a director of NTWRK, an e-commerce startup co-founded by Iovine's son and owns over 10 percent of the

18

company. Live Nation is also an investor in NTWRK and leases NTWRK office space. Iovine is an advisor to Flipper's World, first known as Flipper's Roller Boogie Palace, and Rapino and Carter sit on the board. Flipper's World and Flipper's Roller Boogie Palace are the trade names of Backflip House, LLC, where Iovine sits on the board. Iovine owns over 10 percent of Flippers SunnySkies NotToday LLC, which is an investor in Backflip House, LLC. From 2014 to the present, Iovine received over $2,530,356 in compensation from Live Nation, including $958,750 in fees earned or paid in cash and $1,571,606 in stock awards. As of April 16, 2025, Hollingsworth beneficially owned 35,236 shares of Live Nation common stock, worth $4,420,708.

28.    Defendant James S. Kahan ("Kahan") has served on the Live Nation Board since 2007. He is a member of the Board's Audit Committee. He also serves as a director of Catch Media, Inc., where former Live Nation board member Ari Emanuel is a member of the Advisory Board. Kahan previously sat on the board of Frontier Communications Corporation, as did former Live Nation board member Mark Shapiro. From 2007 to the present, Kahan received over $4,300,687 in compensation from Live Nation, including $1,715,625 in fees earned or paid in cash and $2,572,372 in stock awards. As of April 16, 2025, Kahan beneficially owned 2,447 shares of Live Nation common stock, worth $307,000.

29.    Defendant Randall Mays ("Mays") has been a Live Nation director since 2005. He is the Chair of the Nominating and Governance Committee and a

19

member of the Compensation Committee and the Executive Committee. From 2005 to the present, Mays received over $4,966,944 in compensation from Live Nation, including $1,707,250 in fees earned or paid in cash and $3,259,744 in stock awards. As of April 16, 2025, Mays beneficially owned 107,107 shares of Live Nation common stock, worth $13,437,644.

30. Defendant Richard A. Paul ("Paul") has served on the Live Nation Board since April 2023. He is the founder and CEO of KLUTCH Sports Group, in which Live Nation director Carter is a minority partner. He is a minority partner in Carter's The SpringHill Company. He also serves as Head of Sports for United Talent Agency ("UTA") and was appointed to UTA's Board of Directors in 2020. From 2023 to the present, Paul received over $606,171 in compensation from Live Nation, including $186,250 in fees earned or paid in cash and $419,921 in stock awards. As of April 16, 2025, Paul beneficially owned 2,813 shares of Live Nation common stock, worth $352,918.

31. Defendant Dana Walden ("Walden") served as a member of the Live Nation Board from June 2017 until June 2023, when Paul took over her seat. From 2017 to June 2023, Walden received over $1,262,533 in compensation from Live Nation, comprising $442,500 in fees earned or paid in cash and $820,033 in shares of Live Nation common stock

32. Defendant Latriece Watkins ("Watkins") has served as a Live Nation director since September 2021. She is Executive Vice President and Chief

20

Merchandising Officer for Walmart U.S. From 2021 to the present, Watkins received over $982,040 in compensation from Live Nation, including $336,250 in fees earned or paid in cash and $645,790 in stock awards. As of April 16, 2025, Watkins beneficially owned 5,285 shares of Live Nation common stock, worth $663,056.

33.    Defendants Rapino, Maffei, Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Mays, Paul, Walden, and Watkins are collectively referred to herein as the "Director Defendants."

34.    Defendants Rapino, Maffei, Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Mays, Paul, and Watkins are collectively referred to herein as the "Demand Board Defendants."

**D. Officer Defendants**

35.    Defendant Joe Berchtold ("Berchtold") is Live Nation's President and Chief Financial Officer. Between 2021 and 2024, Berchtold received over $70 million in total compensation from Live Nation.

36.    Defendant Brian Capo ("Capo") is Live Nation's Chief Accounting Officer. Between 2021 and 2024, Capo received approximately $3.07 million in total compensation from Live Nation.

37.    Defendant John Hopmans ("Hopmans") has been Live Nation's Executive Vice President, Mergers & Acquisitions and Strategic Finance, since April 2008. He "[leads] a team of merger and acquisition specialists controlling all M&A activity" at Live Nation, including Live Nation's merger with Ticketmaster

21

and acquisition of other ticketing and live entertainment companies. Between 2021 and 2024, Hopmans received over $33 million in total compensation from Live Nation.

38.    Defendant Michael Rowles ("Rowles") has been Executive Vice President and General Counsel at Live Nation since March 2006. Between 2021 and 2024, Rowles received over $13 million in total compensation from Live Nation.

39.    Defendants Rapino, Berchtold, Capo, Hopmans, and Rowles are collectively referred to herein as the "Officer Defendants."

40.    Defendants Rapino, Maffei, Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Mays, Paul, Walden, Watkins, Berchtold, Capo, Hopmans, and Rowles are collectively referred to herein as "Defendants."

**E. Relevant Non-Parties**

41.    Liberty Media Corporation ("Liberty Media") is a mass media company that operates and owns interests in a range of media, communications, sports and entertainment businesses. As of April 19, 2024, Liberty Media owned 69,645,033 shares of Live Nation common stock, equating to approximately a 30% share of the company. In 2009, in connection with the 2010 Live Nation-Ticketmaster merger, Liberty Media entered into a stockholder agreement with Live Nation and Ticketmaster. Under the agreement, Liberty Media has the right to directly or indirectly acquire, by means of a purchase, tender or exchange offer, business combination or otherwise, beneficial ownership of Live Nation equity

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

securities in excess of 35 percent of the total voting power of all Live Nation equity

securities. Liberty Media also has the right to nominate two members of the Live

Nation board. The two Liberty-nominated directors are Maffei, the Chairman of the

Board (until June 12, 2025), and taking his place, Carl Vogel ("Vogel") (who joined

the Board on June 12, 2025), and Hollingsworth.

42.    Oak View Group, LLC ("OVG") is a leading American venue

development and management company. Its portfolio includes over 200 venues in

the United States, including more than 100 venues that it manages but does not own.

OVG was founded in 2015 by Irving Azoff ("Azoff") and Timothy J. Leiweke. Azoff

previously served as the CEO of Ticketmaster and the Chairman of Live Nation. He

is also an investor in Full Stop Management, one of the world's leading artist

management companies.

## III.    JURISDICTION AND VENUE

43.    This shareholder derivative action is brought pursuant to Fed. R. Civ.

P. 23.1. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as

well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa, over the claims asserted

herein for violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78(n)(a) and

the rules promulgated thereunder. This Court has supplemental jurisdiction over the

state law claims asserted herein under 28 U.S.C. § 1367.

44.    This Court has personal jurisdiction over each Defendant named herein

because Nominal Defendant Live Nation maintains and operates its principal

23

executive offices in this District, and Defendants maintain a place of business in or reside in this District or have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

45.    Venue in this District is proper because Nominal Defendant Live Nation is headquartered in this District. Additionally, a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## IV.    SUBSTANTIVE ALLEGATIONS

### A. Defendants Owe Fiduciary Duties to Oversee Live Nation's "Mission Critical" Compliance with U.S. Antitrust Laws.

46.    The Sherman Act is a federal statute that prohibits activities that restrict competition in the marketplace. The Sherman Act is codified in 15 U.S.C. §§ 1-38, and was amended by the Clayton Act in 1914. It outlaws any contract, conspiracy, or combination of business interests in restraint of interstate or foreign trade or commerce, as well as monopolizing or attempting to monopolize interstate or foreign trade or commerce.

47.    The Sherman Act applies to the U.S. live entertainment market, in which Live Nation operates. Moreover, many U.S. states have enacted antitrust laws similar to the Sherman Act.

48.    Section 1 of the Sherman Act prohibits unreasonable contracts or combinations in restraint of trade. 15 U.S.C. § 1. Section 2 of the Sherman Act

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

prohibits monopolization and attempts to monopolize. 15 U.S.C. § 2. Companies operating in the live entertainment market in the U.S. must comply with the Sherman Act's Sections 1 and 2. The obligation to ensure a company's compliance with the Sherman Act falls on its directors and officers, who must set up a system of internal controls to alert themselves to anticompetitive actions and take actions to cease those activities. As further detailed below, Defendants, who are Live Nation's directors and executive officers, authorized and participated in unlawful anticompetitive business practices to increase Live Nation's profits and their own compensation, while they also acted in bad faith by failing to oversee the Company's mission critical compliance with antitrust laws in the U.S. and ignoring glaring red flags of anticompetitive conduct by the Company.

**B. Since their Formations, Live Nation and Ticketmaster Have Engaged in Anticompetitive Actions to Increase Their Companies' Respective Market Shares and Profits.**

49.    Live Nation's predecessor SFX Entertainment ("SFX") was founded in 1996, when its founder Robert F.X. Sillerman began acquiring concert promotion companies across the U.S. SFX spent $2 billion from 1996 to 1999 acquiring independent promoters—including acquiring more than twenty (20) companies in less than a year—significantly consolidating the concert promotion industry.

50.    In 2000, the media corporation Clear Channel Communications purchased SFX for $3 billion, along with a group of other concert promoters, to create Clear Channel Entertainment. At this point, SFX already controlled more than

25

130 venues. This acquisition made Clear Channel Entertainment the largest concert promoter in the U.S. Using the company's size and influence, it began to utilize "heavy-handed tactics" to "leverage" its concert promotion business as well as Clear Channel Communications' radio broadcasting business, which was also the nation's largest. In 2001, an independent concert promotion company brought a lawsuit against Clear Channel alleging that Clear Channel weaponized the synergy between these two businesses to "coerc[e] artists to use Clear Channel to promote their concerts or else risk losing [radio] air play and other on-air promotional support." Clear Channel also faced a class action "on behalf of concert-goers" across the United States, alleging that the company "used its market dominance in anticompetitive activities," such as "us[ing] predatory practices to keep potential competitors from entering regional markets," "that unfairly increased ticket prices for consumers and coerced artists to use Clear Channel for concert promotion." And like SFX, Clear Channel also faced a DOJ investigation for "using its market position to shut out its competitors"—specifically, for "restrict[ing] the [radio] airplay time of music artists unwilling to use its concert promotion services."

51.    While Live Nation's predecessors were consolidating the concert promotions industry, Ticketmaster was cementing its dominance in the ticketing services industry. Founded in 1976, Ticketmaster seized control over the industry in 1991 when it acquired Ticketron, one of its largest competitors, as well as other smaller competitors like Paciolan and ticket resale websites TicketsNow and

26

GetMeIn, ultimately giving the company 90% of the ticketing market. By 2009, Ticketmaster had maintained a market share of over 80% in the ticketing services market for fifteen years.

52.     Live Nation's predecessors' rollup of concert promotion companies and control over increasing numbers of venue, combined with Ticketmaster's domination of the ticketing industry, led to significant increases in ticket pricing during this period. "Between 1996 and 2003, the average concert ticket price rose 82 percent," while the Consumer Price Index rose only 17 percent.

53.     In 2005, Clear Channel Communications spun off Clear Channel Entertainment to create Live Nation, the corporate form in existence today. Before the spinoff was completed, Clear Channel appointed Defendant Rapino as CEO of Clear Chanel Entertainment, where he had been serving as president and CEO of the music unit. Rapino remained as Live Nation's CEO and President, as well as a member of its Board, once the Company was spun off. He has continuously served in those positions ever since.

**C. The Live Nation-Ticketmaster Merger Ends Competition Between the Two.**

54.     For the past two decades, Defendant Rapino has led Live Nation's anticompetitive business strategies, which continue to this day in the tradition of Live Nation's predecessors: rolling up smaller entertainment companies to consolidate power in the live entertainment industry. Rapino described this

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

consolidation strategy as part of the Company's DNA "from day one," describing Live Nation's "mission" as "transforming a declining and fragmented live entertainment company into a vertical live music growth company."

55.     Consistent with Live Nation's anticompetitive goal to consolidate more power in the live entertainment industry, Live Nation's business strategy focused on Ticketmaster, with which it merged after mounting a direct challenge to Ticketmaster's business.

56.     Live Nation had been Ticketmaster's largest primary ticketing client since 2001, when Live Nation's predecessor Clear Channel Entertainment entered into an exclusive contract for Ticketmaster's services. Specifically, Live Nation was reported to account for more than 15 percent of Ticketmaster's roughly $1 billion in revenue in 2006. In 2007, however, Live Nation announced that it would not renew its contract with Ticketmaster when the contract expired on December 31, 2008. Instead, Live Nation would seek to become Ticketmaster's direct competitor by licensing software to build its own primary ticketing service—to use for its own venues as well as to compete with Ticketmaster for third-party venues.

57.     Ticketmaster attempted to defend against Live Nation's forthcoming competition in various ways. Ticketmaster offered its existing customers with expiring contracts more attractive renewal terms than it customarily offered to lock customers into long-term deals before Live Nation could sign them. Ticketmaster also acquired artist management company Front Line Management, which allowed

28

Ticketmaster to offer a package of primary ticketing services and artist management that could compete with Live Nation's ticketing-and-promotions package.

58.    After spending nearly two years evaluating, licensing, and developing a ticketing platform, in late December 2008, Live Nation launched its ticketing service. Live Nation's ticketing service was uniquely positioned to compete directly with Ticketmaster because it "could achieve sufficient scale to compete effectively . . . simply by ticketing its own venues," which, at the time, included approximately seventy (70) major concert venues throughout the U.S.

59.    Instead of continuing to compete, on February 10, 2009—less than two months after Live Nation's entry into the primary ticketing market—Ticketmaster agreed to merge with Live Nation. In doing so, Live Nation and Ticketmaster recognized that the vertical integration of their complementary businesses would allow the merged company to bundle primary ticketing services (explicitly or implicitly) with access to artists managed by Front Line and/or promoted by Live Nation, and thereby to foreclose competitors' ability to compete on those individual services.

60.    The announcement of the merger sparked criticism from all parts of the live music industry, consumer groups, and lawmakers. The musician Bruce Springsteen spoke out against the merger, saying that "the one thing that would make the current ticket situation even worse for the fan than it is now would be Ticketmaster and Live Nation coming up with a single system, thereby returning us

29

to a near monopoly situation in music ticketing." A concert promoter testified at a Senate hearing that if the merger took place, "all independent promoters" would be at "an irreparable, competitive disadvantage." A music producer described the two companies as "Goliaths" and testified that "their unification will create a business with extraordinary market power and clout unlike any that I have ever seen in my lifetime." Senator Chuck Schumer warned that "[t]his merger would give a giant new entity unrivalled power over concert-goers and the prices they pay to see their favorite artists and bands." He encouraged the DOJ and the Federal Trade Commission ("FTC") to "view [ the merger] skeptically and scrutinize[ it] with a fine-toothed comb."

### D. Live Nation Agrees to the 2010 Consent Decree to Merge Ticketmaster.

61.    After nearly a year of investigating the merger and negotiating with Live Nation, on January 25, 2010, the DOJ and seventeen (17) states, later joined by two additional states, filed a complaint and a related settlement allowing the merger to proceed only under certain conditions. The DOJ challenged the merger under Section 7 of the Clayton Act, 15 U.S.C. § 18, on the basis that it would "substantially lessen competition in the provision and sale of primary ticketing services for major concert venues[.]" The proposed consent decree required, among other things, the merged firm to license a copy of the Ticketmaster host platform software to Anschutz Entertainment Group, Inc. ("AEG"), the second-largest concert promoter;

30

to divest Paciolan to Comcast-Spectacor, L.P. or another acceptable buyer; and to abide by certain other behavioral restrictions intended to promote competition.

62.    The same day, Live Nation closed the merger with Ticketmaster "following the receipt of regulatory clearances and approvals" from the U.S. government and the companies' stockholders.

63.    On March 18, 2010, Christine A. Varney, Assistant Attorney General for the DOJ's Antitrust Division, explained the DOJ's reasoning for intervening in the merger. She stated, "Live Nation and Ticketmaster presented a union between two leading players in the chain of live music production: promotion, venue operation, and nascent self-ticketing for Live Nation; and primary ticketing and artist management for Ticketmaster. In antitrust parlance, this transaction presented an instance of both 'horizontal integration' - that is, two direct competitors coming together - and also 'vertical integration' because key elements of the merging parties' businesses were situated above and below each other in the supply chain."

64.    Varney also warned Live Nation that "[the DOJ] will be vigorously monitoring for compliance, and [it] will actively solicit input from you and others in the music business to make sure the merged entity does not violate its agreement." Varney also made clear that "the Antitrust Division retains its power under Section 1 of the Sherman Act to address unreasonable restraints of trade and under Section 2 of the Sherman Act to attack any behavior that constitutes an illegal monopolization of a segment of the live music industry." Varney further stated that

"it is up to independent actors and firms to figure out their business models. If those players believe they have a profitable model that a competitor is preventing them from getting off the ground, we need to know that [because the DOJ] want[s] to have an ongoing conversation with the industry about the post-merger landscape and the ability of industry players to fairly compete in order to find the truly troubling cases, if they exist."

65.    On July 30, 2010, the court entered the final judgment of the consent decree (i.e., the 2010 Consent Decree). The 2010 Consent Decree "prohibited [Live Nation] from retaliating against concert venues for using another ticketing company, threatening concert venues, or undertaking other specified actions against concert venues for ten years" from the date the order was entered – July 30, 2020.

66.    The 2010 Consent Decree sought to accomplish this by instituting structural, behavioral, and monitoring measures to safeguard primary ticketing. Among other structural safeguards, the 2010 Consent Decree ordered Ticketmaster to license its ticketing platform to AEG and forbade Ticketmaster from servicing AEG venues, to ensure that at least one ticketing competitor with sufficient "scale and credibility" would remain in the market. The 2010 Consent Decree also required Ticketmaster to divest to Comcast-Spectacor its Paciolan line of business, which "allow[ed] venues to host their own primary ticketing service on their own websites, and thus create[d] a form of venue-ticketing integration rather than the promoter-ticketing integration entailed by the AEG licensing agreement." This measure sought

32

to protect a different business model that could also compete against Live Nation-Ticketmaster's model.

67.    The behavioral measures prohibited the merged company from retaliating against any venue that considers working with or does work with another primary ticketing service and from conditioning or threatening to condition one of its services on the other. In other words, Live Nation could not withhold its promotions services from a venue just because the venue had decided to work with a different primary ticketer. However, the 2010 Consent Decree did not prevent Live Nation "from bundling [its] services and products in any combination or from exercising [its] own business judgment in whether and how to pursue, develop, expand, or compete for any ticketing, venue, promotions, artist management, or any other business, so long as [the Company] do[es] so in a manner that is not inconsistent with the provisions of th[e 2010 Consent Decree]."

68.    The 2010 Consent Decree also sought to prevent "anticompetitive abuse of Ticketmaster's unique store of ticketing data," which it had accumulated from its years of market dominance. Ticketmaster had to "either refrain from using its ticketing data in its promotion and management business, or it must give that information to other managers and promoters." Ticketmaster also had to "provide its existing venue clients with their ticketing data on request, which will reduce the costs of switching from one ticketing service to another."

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

69.    To ensure that Live Nation complied with its provisions, the 2010 Consent Decree permitted the DOJ, "from time to time" and "on reasonable notice" to Live Nation, to review the Company's documents and to interview Live Nation's officers, employees, or agents. The DOJ could also send the Company "written request[s]" for reports about "any of the matters contained in" the 2010 Consent Decree and could require Live Nation to conduct an independent audit or analysis on those matters.

70.    Contemporaneously with the 2010 Consent Decree, Live Nation and Ticketmaster jointly resolved an action from the Canadian Bureau of Competition, which had brought similar antitrust claims related to the ticketing and promotion markets and called the merger a "disturbing development." The Company's agreement with the Canadian Bureau of Competition was on substantially the same terms as the 2010 Consent Decree.

**E. Despite the 2010 Consent Decree, Live Nation Continued Pursuing Anticompetitive Business Strategies to Increase its Profits and its Executive Compensation with the Board's Knowledge and Support.**

71.    After agreeing to the 2010 Consent Decree, Live Nation did not heed the DOJ's warning to stop using anticompetitive actions to increase the Company's profits, along with its monopoly over multiple aspects of the U.S. live entertainment market. Instead, under Defendant Rapino's leadership, Live Nation continued to engage in various forms of anticompetitive conduct as part of the Company's unlawful business strategy to cement, protect, and expand its dominance within the

34

Case 2:25-cv-05538-KK-AS    Document 27    Filed 07/03/25    Page 40 of 185    Page ID #:700

live entertainment industry. In fact, the Officer Defendants were improperly incentivized to pursue the Company's unlawful anticompetitive business strategies to increase their compensation. Specifically, each year the Board set financial goals for the Company to achieve based on AOI targets. AOI is a non-GAAP financial measure that the Board defines "as operating income (loss) before certain acquisition expenses…, amortization of non-recoupable ticketing contract advances, depreciation and amortization…, loss (gain) on disposal of operating assets, and stock-based compensation expense." A large portion of the Officer Defendants' annual compensation, including large cash bonuses, are "at risk," which meant they were not fully paid unless the Company reached the Board's AOI targets. Defendants Rapino, Berchtold, Capo, Hopmans, and Rowles received massive cash performance benefits that were tied to those same AOI targets, especially when they exceeded those targets.

72.     Live Nation's business strategy included the following kinds of anticompetitive conduct, among others:

- Acquiring or entering into joint ventures and other contractual agreements with potential competitors and nascent threats to neutralize any competition;

- Threatening and intimidating, directly or through intermediaries, rivals or potential threats, and otherwise pressuring them, to blunt expansion into U.S. concert promotions;

- Colluding with a would-be competitor to avoid competition in the concert promotions market;

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

- Inducing venues to sign long-term exclusive ticketing contracts that protect Ticketmaster;

- Conditioning artists' access to Live Nation's large network of amphitheaters and other venues on choosing Live Nation as the promoter, which enables the Company to expand its control over artists and third-party venues; and

- using these anticompetitive practices to increase Live Nation's share of the sales made in secondary ticketing markets.

### 1. Live Nation used acquisitions, joint ventures, and other contractual agreements to stifle its competition while increasing its profits.

73.    Even though its acquisition of Ticketmaster led to the entry of the 2010 Consent Decree, Live Nation continued to pursue a strategy of acquiring nascent threats and neutralizing rivals to protect and expand its businesses across the live entertainment industry. Live Nation acquired promoters, amphitheaters, festivals, other venues, and small ticketers, along with entering into long-term exclusive booking contracts with many venues. As further detailed below, Live Nation's internal documents show that the Company viewed some businesses as its "biggest" threats, even though many of these rivals were relatively small when Live Nation acquired them. To address these small companies' potential to disrupt its business on the margins, Live Nation moved aggressively to acquire or coopt key independent promoters, even when the economics of a particular deal did not make sense for its promotions business. Live Nation personnel justified these transactions by emphasizing the anticompetitive long-term benefit to Live Nation of reducing

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

promoter competition for artists, including by "keeping the [artist] guarantees down" and stopping competitors from "driving the price up" for artists.[1]

74.    As Live Nation continued to acquire promoters, the Company's aggressive acquisition strategy began to constrain artists' choice of promoters. "This became especially true for nationwide tours and had the effect of further increasing venues' dependence on Live Nation for content. As a major venue in New York City recognized, Live Nation made significant acquisitions of top independent promoters over the past decade, eliminating most mid-tier promoters and leaving primarily small, concert promotion companies with little market share."[2]

75.    Below are some specific examples of Live Nation's acquisition strategy, which illustrate how Live Nation's officers and the Board engaged in anticompetitive business strategies, which were not specifically covered under the requirements of the 2010 Consent Decree, to further solidify and expand the Company's monopolies in the live entertainment market to increase Live Nation's profits and their own compensation without taking any steps to ensure that those strategies complied with U.S. antitrust laws.

a.   **AC Entertainment.**

---

[1] *Live Nation Ent., Inc.*, No. 1:24-cv-03973-AS, ECF No. 257 ("DOJ Am. Compl.") at ¶ 119.
[2] *Id.* at ¶ 120.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

76.   In 2016, Live Nation acquired a controlling stake in AC Entertainment, a regional independent promoter in the Southeast and one of Live Nation's internally designated "Biggest Competitor Threats." AC Entertainment promoted over 1,000 shows a year, including arena and amphitheater shows. AC Entertainment also controlled the venue booking decisions at 14 theaters and clubs throughout Tennessee and the Carolinas and promoted major music festivals like Bonnaroo.[3]

77.   Live Nation pursued the acquisition even though it had doubts about the standalone economics of the deal. Instead, Live Nation's internal justifications were anticompetitive. Live Nation's Chief Strategy Officer explained to Live Nation executives that "[t]he numbers are not super exciting and this feels like more of a defensive move to (I) Keep [rival] AEG out of the region especially creating situation [sic] where [a well-known artist manager] can play both sides in Nashville." Live Nation's Chief Strategy Officer also recognized that the acquisition helped "grow[] our moat in the [Nashville] market," while another internal document touted the benefit of "lower competition in the Region and specifically in Nashville."[4]

### b.  United Concerts.

78.   In 2017, Live Nation acquired United Concerts, a promoter and venue owner that owned the most popular amphitheater in Utah, as well as other venues.

---

[3] *Id.* at ¶ 124.
[4] *Id.* at ¶ 125.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

Live Nation acquired United Concerts in part to eliminate a potential promotions competitor and to starve a competing primary ticketer of customers.[5]

79.    Before Live Nation acquired United Concerts, many venues in Utah, including United Concerts' venues, used a regional ticketing company called SmithsTix. Live Nation noted internally that SmithsTix had taken Ticketmaster's "last client in Utah" and left a "barren landscape[]" for Ticketmaster in the state. Live Nation chose not to acquire SmithsTix directly because doing so would "require us to go to the DOJ [to notify them as required under the 2010 Consent Decree that it planned to acquire a primary ticketing company] and that's something we wouldn't necessarily want to do."[6] Instead, Live Nation skirted the notification requirements of the 2010 Consent Decree and went for a bigger fish: it acquired United Concerts itself, and then switched United Concerts' venues' ticketer to Ticketmaster. Left "with only a few small clients," SmithsTix ultimately went out of business.[7]

### c. ScoreMore Shows.

80.    ScoreMore Shows was a regional promoter in Texas that Live Nation identified by Live Nation's officers as a "Competitor Threat." "Around 2017, Live Nation agreed with ScoreMore not to compete to sign artists in Dallas and instead to pool their collective revenues to co-promote artists. After that agreement was in place, in 2018, Live Nation acquired a majority stake in ScoreMore Shows." In

---

[5] *Id.* at ¶ 122.
[6] *Id.* at ¶ 123.
[7] *Id.* at ¶ 124.

39

internal Live Nation documents, the Company celebrated that ScoreMore and Live

Nation were "no longer competing" or "driving the price up" for booking artists.

Live Nation replaced competition with collusion. As the CEO of ScoreMore Shows

said to Live Nation:

> [Y]ou are forgetting that in pooling these revenues it also meant
> that we were no longer competing. We weren't driving the price
> up, either. We haven't been sending offers or telling agents
> anything but "yes, that's good, we work with LN, we will
> copro[mote] there." [S]o if we were on our own (without the
> pool), sending our own offers, putting in indie rooms, driving the
> price up . . . do you think the [contribution margin] would be the
> same? [W]ould you still think we don't provide the value?

81.    By no longer competing with ScoreMore, Live Nation was able to

increase its market share by booking more shows while paying less to artists. Rapino

wrote to ScoreMore's CEO, "I agree that measurement is what you book and what

you stand down for [the] overall win. . . ."[8]

82.    ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[8] *Id.* at ¶ 135.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

[black redaction bars]

#### d. **Frank Productions and National Shows 2.**

83.    In 2018, Live Nation acquired a "Biggest Competitor Threat," rival promoter Frank Productions. Frank Productions owned four theaters and clubs in Wisconsin, one of which competed with a Live Nation-operated venue. When its owners were looking to sell the business, Live Nation jumped at the opportunity to acquire another competitor, and to prevent another rival from acquiring it instead.[9]

84.    Live Nation used this acquisition partly to switch Frank Productions' venues to Ticketmaster. Frank Productions previously hired other primary ticketing service providers instead of Ticketmaster because it had "a difficult time wrapping their head around why they would do business with a company [Live Nation/Ticketmaster] who will be in direct competition with them in their home

---

[9] *Id.* at ¶ 126.

41

market." Live Nation executives explained in a presentation to the Board: "Current ticketing arrangements for certain venues with Ticketfly and Etix [are] set to expire within 2 years" and that, after the acquisition, "[Ticketmaster] to become exclusive ticketing provider for all live events booked or promoted following the expiration of current agreements." Live Nation saw that Frank Productions' venues' ticketing contracts were set to expire soon and acquired the company to trap the venues in exclusive Ticketmaster contracts.[10]

85.    Live Nation also acquired Frank Productions' subsidiary, National Shows 2, yet another firm listed as a "Competitor Threat." National Shows 2, which promoted over 350 shows per year in the United States, was one of a small number of competitors to Live Nation in the Nashville region after Live Nation bought AC Entertainment, the acquisition described infra ¶¶76-77 in 2016.[11]

86.    █████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████.

---

[10] *Id.* at ¶ 127.
[11] *Id.* at ¶ 128.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

[REDACTED]

1

2

3

4

5

6

### e. Red Mountain Entertainment.

87.    In 2018, Live Nation also acquired Red Mountain Entertainment, a regional promoter that promoted shows in Alabama and Mississippi, including several music festivals in the Southeast. At the time of the acquisition, Red Mountain also operated and/or exclusively booked concerts at three amphitheaters in the Southeast. Live Nation had been aware of Red Mountain since at least 2016 when a Live Nation executive stated that the Company had an "active plan to mitigate further expansion" by Red Mountain because Live Nation "[c]an't get complacent and let small guys encroach from the edges." Live Nation found that Red Mountain's control of an amphitheater in Tuscaloosa was driving up compensation to artists, and so it wanted control of the amphitheater to "keep[] the guarantees down" to artists.[12]

88.    As Red Mountain grew, Live Nation applied what it called a "velvet hammer," warning that it would cut off "the content flow on artist[s]" to Red Mountain venues if Red Mountain continued to compete with Live Nation's promotions services. A Live Nation executive described the message he

---

[12] *Id.* at ¶ 129.

43

communicated to Red Mountain: "Either we are together or we are competitors. Seemed to work, as they had 3 venues, 2 festivals and another venue coming online in [20]18, and wanted the content flow on artists where we had touring rights to in the U.S. Velvet Hammer." Red Mountain ultimately agreed to sell its business to Live Nation.[13]

89.  ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████

### f.  313 Presents.

90.    In 2018, Live Nation further took control over a Detroit-based competitor, 313 Presents ("313"), when it entered into a multifaceted non-compete agreement. Before the agreement, Live Nation recognized 313's predecessors,

---

[13] *Id.* at ¶ 130.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

Palace Sports and Olympia Entertainment, as "competitors" because they "make direct offers to artists." Accordingly, Live Nation and the cofounder of OVG concocted a "scheme" to "put [Olympia] out of the promoting side." "Under the agreement, Live Nation agreed not to compete in the development, operation, or ownership of venues in the Detroit market, while 313 promised 'not [to] bid against Live Nation' for artist talent. 313 recognized that 'absent all parties coming together, we would be forced into a competition that would only benefit artists.'"[14]

91.    Live Nation and 313 also agreed on other terms, including "(1) to pool certain revenues across aspects of the Detroit market; (2) Live Nation would serve as the exclusive promoter for all three amphitheaters controlled by 313, which are the three largest amphitheaters in the Detroit market; (3) 313 would provide Live Nation the opportunity to co-promote any shows purchased by 313 for Little Caesars Arena or Comerica Park in Detroit; and (4) that Live Nation would not build, develop, own, or operate any music or comedy venue in the Detroit market."[15]

92.    The agreement benefited both parties by blocking competition. 313 was able to reduce its talent costs and avoid competition from an expanding venue operator. Live Nation defused another promotions competitor, obtained exclusive

---

[14] *Id.* at ¶ 131.
[15] *Id.* at ¶ 132.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

deals at three amphitheaters, and committed several venues to exclusive contracts with Ticketmaster for years to come.[16]

### 2. Live Nation Colluded with OVG To Take Anticompetitive Actions.

93.    Live Nation has also engaged in anticompetitive actions through its long-term relationship with OVG, a leading American venue development and management company, which has over 200 venues in the U.S., including more than 100 venues that it manages but does not own. One of OVG's cofounders, Irving Azoff ("Azoff"), has longstanding ties to Live Nation and the live entertainment and ticketing industries. In 2008, Azoff became CEO of Ticketmaster when it acquired his artist management company, and in 2011, he was named chairman of Live Nation. Azoff also owns Full Stop Management, one of the U.S.'s top artist management companies. The other cofounder, Tim Leiweke, also has decades of experience in the live entertainment industry. He previously served as president and CEO of AEG, the second-largest live entertainment company after Live Nation, and Maple Leaf Sports & Entertainment, a professional sports and commercial real estate company that owns four professional sports franchises.

94.    OVG's connections to venues and relationships with artists position the company as a strong competitor to Live Nation in the U.S. concert promotion industry. OVG also has access to significant capital through its relationship with

---

[16] *Id*. at ¶ 133.

46

Silver Lake, which invested $100 million in the company in 2018 and now holds a controlling stake.[17]

95.    Shortly after OVG was founded, Live Nation categorized it as one of its "Biggest Competitor Threats." Indeed, Live Nation identified three options to deal with OVG's competitive threat: "1) Lead 2) Follow 3) or get out of the way." Live Nation decided to "get out of the way" of OVG for arena consulting, and OVG agreed to get out of the way of Live Nation for concert promotions. Sometimes, Live Nation Arenas and OVG partner to work with venues, rather than compete for their business, and share profits on the joint contracts. Live Nation and OVG collaborate so closely that they entered into these venue partnerships through verbal agreements. Moreover, OVG can use its venue development deals, venue management deals, and venue alliances to help book Live Nation content at venues across the country and require or encourage the use of Ticketmaster at these venues.

96.    OVG and Live Nation, therefore, have created a mutually beneficial working relationship, seeking to avoid competing against each other entirely. In fact, OVG has described itself as a "pimp" and "hammer" for Live Nation, acting as its agent to influence venues and artists for Live Nation's benefit. OVG's CEO recently emphasized to Rapino, "[j]ust like I tell our folks we 100% always protect you and

_____

[17] *Id.* at ¶ 71.

47

LN on your lanes," and "I always protect you on rebates, promotor position, ticketing."[18]

97.    Live Nation executives' anticompetitive collaboration exposed Live Nation to scrutiny from antitrust regulators, particularly given the consumer impact.

98.    For example, Live Nation and OVG agreed to avoid competing against each other entirely in the concert promotions business. As a result, in 2016, when Rapino found out that OVG sought to promote an artist that Live Nation had previously promoted, Rapino immediately emailed OVG to warn the company that its efforts to compete with Live Nation would lead only to artists demanding more compensation, to Live Nation's and OVG's loss. He wrote: "whats up? We have done his [touring] and vegas[.] Let's make sure we don't let [the artist agency] now start playing us off."[19] Timothy Leiweke, OVG's CEO and cofounder, immediately surrendered: "Our guys got a bit ahead. All know we don't promote and we only do tours with Live Nation." OVG's other cofounder added: "Growing pains," and then confirmed that OVG's executives "should never discuss comp [for artists]" and that OVG's talent buyers "would work for Live Nation."[20]

99.    Similarly, in 2019, when OVG was approached about potentially bidding on a tour, an OVG Senior Vice President explained to a colleague, "[i]t has

---

[18] *Id*. at ¶ 72.
[19] *Id*. at ¶ 73.
[20] *Id*.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

been our policy to stay on the sidelines when it comes to buying and specifically promoting tour dates as we are cognizant not to compete with our partner Live Nation in this side of the business."[21]

100.    Live Nation also stopped competing with OVG on its arena consulting business. Soon after OVG was founded, the company "formed an alliance" with venues to provide "insights and access to premier sports and live entertainment content," which pit OVG against Live Nation's own consulting business, Live Nation Arenas. To avoid competing with Live Nation, OVG's CEO proposed that Live Nation Arenas combine with OVG and that the head of Live Nation Arenas join OVG's alliance board of advisors, which he did. In this proposal, OVG's CEO told the head of Live Nation Arenas, "[w]e are experiencing Arena's that want to play us off one another."[22]

101.    ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████.

---

[21] *Id.* at ¶ 75.
[22] *Id.* at ¶ 76.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

### 3. Live Nation locked venues into exclusive long-term contracts to defeat competition while increasing Ticketmaster's sales.

102.    Despite the 2010 Consent Decree putting Live Nation's directors and officers on notice that the Company should not engage in any anticompetitive behavior, Live Nation's business model relied on the anticompetitive practice of inducing venues to enter into long-term exclusivity contracts. As further described below, Live Nation did this by threatening to withhold access to other parts of its business, such as booking lucrative concerts. Sometimes, Live Nation communicated this threat directly. Other times, Live Nation made the threat implicitly but unmistakably. In some instances, Live Nation used its extensive network to communicate this "choice," which sometimes did not have to be communicated at all. Because of Live Nation's historical conduct, the live concert industry understood that choosing ticketers other than Ticketmaster carries enormous risk and financial pain.[23]

103.    Relying on its reputation, Live Nation began to make its threats more publicly and in a more general way. For example, in 2019, Rapino explained that Live Nation's concert promotions business decides to host concerts "where we make the most economics," which its competitors knew Rapino meant venues that use Ticketmaster for their primary ticketing sales. Venues considering other ticketing companies understood the potential consequences of switching to another ticketer.

---

[23] *Id.* at ¶ 88.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

Some even calculated the losses they would suffer if they switched, and Live Nation foreclosed their access to some of their concerts. Live Nation used this threat, undergirded by its monopoly power, of steering shows away from venues to secure better deals on its promotions services and force venues to adopt Ticketmaster as their primary ticketer.[24]

104.   Live Nation used a variety of methods to retaliate against venues, including pulling or moving concerts, scheduling shows on less desirable and less lucrative dates, reducing promotion for shows, and requiring venues to block secondary ticketing on non-Ticketmaster platforms, which could make potential consumers less likely to commit to buying tickets in the first place and constrain customers who do buy tickets but whose plans change.[25]

105.   Ticketmaster also used the Company's exclusive long-term agreements to improperly increase fees paid by consumers to maximize its profits. Specifically, Ticketmaster shifted who paid the fees for a primary ticketing service provider's services. Before when venues entered into exclusive contracts with Ticketmaster, the venues typically paid such fees. After venues entered into exclusive contracts with Ticketmaster, the fees were paid by consumers. Second, Ticketmaster began paying venues large up-front fees to secure rights to service their primary ticketing, payments that Ticketmaster earned back (in multiples) over the life of its contract.

---

[24] *Id*. at ¶ 89.
[25] *Id*. at ¶ 90.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

These twin steps fundamentally altered the market for primary ticketing services, because they created an economic misalignment between the venues and their consumers.

106. Ticketmaster's exclusive, long-term agreements also blocked more specialized ticketing services and different business models from growing in the live concerts industry. For example, Ticketmaster's exclusivity provisions denied most artists the ability to sell tickets directly to their most passionate fans and "fan clubs" through pre-sale windows. Since third parties often charge less than Ticketmaster, when selling to fan clubs through non-Ticketmaster ticketing systems, artists are better able to control ticketing fees. Through fan clubs or other alternative ticket distribution methods, artists can also offer tickets alongside other experiences and opportunities that can improve the concert experience or increase value for fans. Alternative distribution methods can also provide artists greater control over how, when, and to whom tickets are made available. Ticketmaster previously allowed tickets to be sold through third parties to fan clubs in accordance with its Fan Club Policy. But after acquiring one such third-party provider of tickets to fan clubs in 2018, Ticketmaster began to use its exclusive ticketing contracts with venues to curtail artists' ability to use third-party providers for fan club sales—at the expense

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

of artists' choice and their relationships with fans, along with at the expense of competition within the market.[26]

107. Ticketmaster also used these exclusive contracts to cause rival ticketers to raise their costs. For example, Ticketmaster added an encrypted mobile ticket program, SafeTix, to its products and services in a way that protected its primary ticketing market position, expanded its share of the secondary ticketing market, and undercut its competitors' ability to compete in either market.[27]

108. SafeTix involved replacing the static barcodes on electronic tickets with a constantly refreshing, encrypted barcode. Ticketmaster justified this change to the public by claiming that it would reduce the risk of ticket fraud from stolen or illegal counterfeit tickets. But Ticketmaster could have reduced fraud in less restrictive ways, without using a proprietary, encrypted ticket, which made it more difficult for a fan who wishes to buy or sell a SafeTix-encrypted ticket through a secondary platform to use a rival platform like StubHub or SeatGeek. In fact, Ticketmaster's own documents showed that a primary motivation behind its implementation of SafeTix was for anticompetitive reasons. For example, one document from a Ticketmaster executive meeting in 2014 described the "non-transferrable digital ticket" as "a game-changer." Another document from 2017

---

[26] *Id.* at ¶ 108.
[27] *Id.* at ¶ 109.

53

described the rotating barcode as a "product enhancement[ ] for market share" and an opportunity to "REDUCE TM'S ECONOMIC RISK."[28]

109.    SafeTix also made it unclear when, or even whether, a ticket could even be transferred. In fact, if a ticketholder wanted to sell or otherwise transfer a SafeTix-encrypted ticket, both the ticketholder and the purchaser had to create Ticketmaster accounts (thereby providing Ticketmaster with their data), download the Ticketmaster app, and wait for Ticketmaster to determine when or whether the transfer can be completed. By reducing the incentives to enter secondary ticketing altogether, SafeTix not only reduced competition from existing rivals but also disincentivized prospective innovators from considering secondary ticketing as a viable foothold for entering primary ticketing.[29]

110.    SafeTix also served to increase Live Nation's data advantages over its competitors. According to internal documents, SafeTix was expected to grow the "size/value of the TM database," already by far the largest of any ticketer, by as much as 30 to 40%. As Rapino explained, "[o]ne of the advantages we've launched under the transfer strategy is we now not only know the person that bought the ticket, but we're going to know those three people that you are taking to the show, which we have not known historically." Live Nation could monetize this data through

---

[28] *Id.* at ¶ 110.
[29] *Id.* at ¶ 111.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

Ticketmaster as well as its other businesses to both increase its bottom line and further entrench its positions across the live entertainment industry.[30]

111.    The Company's exclusive long-term contracts with major concert venues further positioned Ticketmaster to dominate the secondary ticket market through anticompetitive actions. In this regard, Ticketmaster used "a tying arrangement," which is "a device used by a seller with market power in one product market to extend its market power to a distinct product market . . . [by] condition[ing] the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." Live Nation used two anticompetitive tying arrangements in this regard. First, Live Nation conditioned the provision of concert promotion services on the use of primary ticketing services from Ticketmaster. Second, the Company conditioned the provision of primary ticketing services on the use of secondary ticketing services from Ticketmaster. Live Nation further used its monopoly power in the primary ticketing market for major concert venues and concert promotion services market to monopolize the market for secondary ticketing services for major concert venues to increase Ticketmaster's profits.

112.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[30] *Id.* at ¶ 112.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10    113.  Likewise,

11

12

13

14

15

16

17

18

19

20    114.  In addition,

21

22

23

24

25

26

27

28

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

[REDACTED]

115. [REDACTED]

[REDACTED]

**4. Live Nation required artists to hire Live Nation as their promoter to gain access to its numerous venues.**

116. Live Nation also used its control over concert venues to limit artists' options and exclude rival promoters—another anticompetitive strategy that subjected the Company to potential antitrust scrutiny and liability. For over a decade, Live Nation maintained a policy of preventing artists who hire third-party promoters from using its venues. That is, if an artist wanted to book a Live Nation venue for their tour, they almost always had to hire Live Nation as the tour's concert promoter.[31]

---

[31] *Id.* at ¶ 113.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

117.   This policy was particularly constraining for artists trying to tour in large amphitheaters, a market in which Live Nation held monopoly power. Because of Live Nation's policy, such artists—many of whom have well-established, dedicated fan bases but have not yet matured their fan base to play larger stadiums— were forced to hire Live Nation as their promoter or risk being locked out of dozens of desirable Live Nation-controlled large amphitheaters in the U.S. Specifically, Live Nation controlled at least 40 of the top 50 amphitheaters in the U.S., and more than 60 of the top 100. No other entity owned more than a handful of amphitheaters in either set. Accordingly, it was nearly impossible for an artist to book an amphitheater tour without involving Live Nation. Live Nation's portfolio of amphitheaters, as well as the Company's anticompetitive promotion policy, allowed the Company to obtain a greater than 70% market share in large amphitheater promotions and become by far the largest promoter of national amphitheater tours. As one Live Nation executive explained, "if [artists] want to do an extensive amphitheater tour with a lot of shows, they would typically be coming to us for that, and they do."[32]

118.   Moreover, in one instance, a senior Live Nation executive told his employees not to increase guaranteed payments offered to artists they knew were looking to book "True Amp Tours." This was because Live Nation knew that these

---

[32] *Id.* at ¶ 114.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

artists almost certainly would need to play several shows at Live Nation amphitheaters, and to do so, they would need to hire Live Nation as their promoter: "we know [artists] are likely playing amphitheaters and we are going to get those in most cases." Live Nation's restrictive amphitheater policies helped the company extend its reach to promoting artists in other venues as well, because many artists would book both amphitheater and non-amphitheater shows for the same tour and would sign with Live Nation to promote the tour in its entirety. In addition, once Live Nation used its exclusionary amphitheater policy to lock in artists early in their careers, it could build relationships with those artists to keep them as they graduated to higher capacity venues, like arenas and stadiums.[33]

119.    For years, Live Nation executives were aware that the Company restricted the use of its amphitheaters and other venues to Live Nation promoted-shows, and often chose to sacrifice additional profits that the Company could be earning if it allowed non-Live Nation-promoted shows to play at those venues. For example, a 2018 internal Live Nation analysis found that its top 10 amphitheaters were "dark," or without shows, "on nearly 50% of their Saturdays in the summer," the highest performing day of the week during the primary performance season.

F. 

---

[33] *Id.* at ¶ 116.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

120. In addition to ███████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

121. For instance, ██████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



122.    A few months later on April 1, 2018, *The New York Times* published an article reporting that eight years after Live Nation's merger with Ticketmaster, "the ticketing business is still dominated by Live Nation and its operations extend into nearly every aspect of the concert world." Live Nation's dominance affected fans' wallets and concert-going experiences, as "[t]icket prices [were] at record highs,"

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

"[s]ervice fees [were] far from reduced," and "Ticketmaster, part of the Live Nation empire, still tickets 80 of the top 100 arenas in the country." "No other company has more than a handful," and "[n]o competitor has risen to challenge its pre-eminence."

123.    Notably, *The New York Times* reported that the DOJ was "looking into serious accusations about Live Nation's behavior in the marketplace." Specifically, the DOJ had received complaints that Live Nation "used its control over concert tours to pressure venues into contracting with its subsidiary, Ticketmaster." Live Nation's "chief competitor, AEG, has told the officials that venues it manages" in certain cities "were told that they would lose valuable shows if Ticketmaster was not used as a vendor, a possible violation of antitrust law." The article further reported that "[t]he Justice Department's inquiries into possible antitrust violations have gone beyond the bitter rivalry [with AEG], with regulators in the past year looking into reports of Live Nation threats at venues that AEG does not manage: at the H-E-B Center outside Austin, Tex.; and at Boston's TD Garden, according to executives familiar with the federal review." This article also states that "[c]ompetitors assert that the bundling [of Live Nation's talent and ticketing services] lets Live Nation pressure venues without ever uttering a threat," as "[i]t's just implied." It further cited that "Rapino has repeatedly boasted to Wall Street that the number of venues it tickets around the world — a statistic it does not release — is constantly growing."

124.    ██████████████████████████████████████████████

█████████████████████████████████████████████████████

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

125.

126.    On August 27, 2018, *The Guardian* reported that "the Association of Independent Festivals (AIF) said [Live Nation] was able to 'stifle competition'"

[34] *See also*

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

within the United Kingdom's music industry, and specifically among independent music festivals. A "festival organiser" told *The Guardian* that Live Nation's share of "the market for events with a capacity of more than 5,000 people"—26%, with its nearest competitor's share at 8%— "was preventing acts from playing as much as they could." "He said he [had] been unable to book even small acts, paid less than £500 per appearance, because they were locked into exclusivity deals to play only Live Nation events." The AIF's chief executive, Paul Reed, echoed members of the U.S.'s live music industry in saying that "Live Nation's high market share risked reducing choice and value for money, particularly given the company's presence in ticketing, artist management and promotion."

127.    On September 18 and 19, 2018, the Canadian Broadcasting Corporation ("CBC") published a two-part series related to its undercover investigation into Ticketmaster's illicit secondary ticketing practices. For example, the second installment revealed how in the U.S., Ticketmaster was "recruiting professional scalpers who cheat its own system to expand its resale business and squeeze more money out of fans . . ." Specifically, the news outlets sent a pair of reporters undercover to Ticket Summit 2018, a ticketing and live entertainment convention at Caesars Palace in Las Vegas, where they posed as scalpers, and equipped with hidden cameras, the journalists were pitched on Ticketmaster's professional reseller program. Specifically, the Company representatives told them that Ticketmaster's resale division turns a blind eye to scalpers who use ticket-buying bots and fake

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

identities to snatch up tickets and then resell them on the site for inflated prices. The

Company did so because those pricey resale tickets include extra fees for

Ticketmaster. For example, one sales representative told them that "I have brokers

that have literally a couple of hundred accounts," and "It's not something that we

look at or report."

128.  ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



129.

130.

131.

66



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    132.

26

27

28

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



1

2

3

4

5

6

7

8

9

10

11

12    133.

13

14

15

16

17

18

19

20    134.

21

22

23

24

25

26

27    135.

28

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



136.    On December 15, 2019, the *Hollywood Reporter* reported that the DOJ was investigating whether Live Nation "should be allowed to buy a competing ticketing company called Rival and take over the startup's contract with billionaire

69

Stan Kroenke," an investor in Rival and the owner of the English soccer team Arsenal and four professional teams in the U.S., including the Denver Nuggets and the Los Angeles Rams. Specifically, "the DOJ [was] investigating accusations that Live Nation threatened to withhold concerts and tours from Kroenke's venues unless Ticketmaster was given the ticketing contract."

137.   The *Hollywood Reporter* also reported that the DOJ was "looking into accusations by SeatGeek and StubHub that Ticketmaster is leveraging its position as primary ticketing's market share leader to prevent fans and professional resellers from selling tickets on sites like SeatGeek and StubHub." The article explained, "[f]or nearly a decade, reps from both companies have complained that Ticketmaster has tried to steer the resale business to its own resale platform TM+ and argue[d] that new technology like paperless tickets give Ticketmaster the power to control which tickets end up on the secondary market."

138.   The article recognized that "the 2010 [Consent Decree] only covered competition in the primary ticketing space, but DOJ officials are considering taking a more expansive view of ticketing to include the secondary market amid increasing calls from Congress to investigate the company." This reporting on new forms of anticompetitive conduct not expressly contemplated in the 2010 Consent Decree demonstrated how Live Nation's anticompetitive business practices continued despite the Company's legal obligations and evolved into different forms and strategies in an attempt to evade those obligations.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

**G. In December 2019, the DOJ Moved to Extend the 2010 Consent Decree for Another Five Years Citing Evidence that Live Nation Had Repeatedly Violated the Decree**

139.   On December 19, 2019, the DOJ filed a motion to reopen the proceedings in *United States v. Ticketmaster Entertainment, Inc.*, after "Live Nation . . . repeatedly and over the course of several years engaged in conduct that violate[d]" the 2010 Consent Decree. "To put a stop to this conduct and to remove any doubt about Defendants' obligations under the [2010 Consent Decree] going forward," the parties proposed modifications to the 2010 Consent Decree "to make clear that such conduct is prohibited." On December 20, 2019, the Court agreed to reopen the case.

140.   In January 2020, the DOJ filed a motion to modify the 2010 Consent Decree and enter a proposed amended final judgment to extend the consent decree through December 31, 2025, to which Live Nation and Ticketmaster agreed (i.e., the 2020 Amended Judgment). Specifically, the DOJ and Live Nation/Ticketmaster agreed to:

- extend certain provisions by five and one half years, to December 31, 2025;

- clarify the parties' obligations under Section IX of the Final Judgment;

- strengthen the compliance provisions, including appointment of an independent monitor and imposition of certain monitoring, notice and reporting obligations on [Live Nation and Ticketmaster];

71

- add new provisions intended to make future investigation and enforcement of the Final Judgment more effective; and

- order [Live Nation and Ticketmaster] to pay the U.S.'s fees and costs associated with investigation and prosecuting its modification motion.

141.    In the memorandum in support of its motion to modify the 2010 Consent Decree, the DOJ explained that:

> The United States has found that, since 2012, Defendants' executives have retaliated against or threatened venues throughout the United States in violation of the Final Judgment's Anti-Retaliation and Anti-Conditioning Provisions. These violations began shortly after the decree was entered in 2010 and have recurred throughout its term, with the most recent known violation occurring as late as March 2019. As a result of this conduct, venues throughout the United States have come to expect that refusing to contract with Ticketmaster will result in the venue receiving fewer Live Nation concerts or none at all. Given the paramount importance of live event revenues to a venue's bottom line, this is a loss that most venues can ill-afford to risk. As a result, many venues are effectively required to contract with Ticketmaster to obtain Live Nation concerts on reasonable terms, limiting the ability of Ticketmaster's competitors to compete in the primary ticketing market and harming venues that would benefit from increased competition.

142.    The DOJ's memorandum detailed how Live Nation violated the plain language of the 2010 Consent Decree to threaten six different venues, whose identities the DOJ kept anonymous "to protect [the] venues that . . . provided evidence regarding Live Nation's conditioning and retaliatory conduct."

143.    In its first example, the DOJ argued that Live Nation and Ticketmaster violated the 2010 Consent Decree's Anti-Conditioning and Anti-Retaliation

72

Provisions "during negotiations with Venue A by first threatening to withhold concerts from Venue A if Venue A did not contract with Ticketmaster, and then refusing to book concerts at Venue A for a year in retaliation for its selection of a competing ticketer":

> In 2017, Venue A issued a request for proposals ("RFP") for a new, two-year exclusive primary ticketing contract. Ticketmaster submitted a proposal and met with Venue A's ticketing committee. Although Venue A's RFP included a request only for ticketing services and not for live content, the Live Nation promoter responsible for deciding where in the region to place Live Nation concerts attended the meeting with Venue A along with two Ticketmaster employees. At the meeting, the Live Nation promoter explicitly threatened to withhold concerts from Venue A if it did not select Ticketmaster. A few weeks later, when Venue A informed the Live Nation promoter that it planned to select a competing ticketer that had offered better financial terms, the promoter responded that the competitor's offer would not be better than Ticketmaster's if Venue A did not receive as many Live Nation shows. The Live Nation promoter went on to specify that Live Nation would not book shows at Venue A unless it had no other options in the market.

> Before Venue A's decision not to contract with Ticketmaster, Live Nation estimated that for the next several years it would book three to four shows per year at Venue A. But in the year following Venue A's switch to Ticketmaster's competitor, Live Nation promoted zero shows at Venue A. Venue A understood that Live Nation's decision to book zero shows at Venue A was retaliation for not selecting Ticketmaster as its primary ticketer.

144.  Similarly, the DOJ argued that Live Nation and Ticketmaster violated the Anti-Conditioning and Anti-Retaliation Provisions of the 2010 Consent Decree "during negotiations to provide primary ticketing services to Venue B." Specifically:

73

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

In 2017, Venue B evaluated offers for primary ticketing services
from Ticketmaster and several competitors. When Venue B
informed Live Nation that it was planning to choose
Ticketmaster's competitor, Ticketmaster's Vice President for
Client Development threatened to withhold all Live Nation
concerts from Venue B if it did not renew its contract with
Ticketmaster. The Ticketmaster VP told Venue B that "if you
move in that direction, you won't see any Live Nation shows."
Ticketmaster's Executive Vice President and Co-Head of Sports
for NBA and NHL Arenas made a similar threat to Venue B,
telling it that Live Nation's CEO would never put one of his
shows on sale through that particular Ticketmaster competitor.

Despite [Live Nation and Ticketmaster's] threats, Venue B
initially selected a Ticketmaster competitor as its primary
ticketing provider. Before Venue B's ticketing decision, Live
Nation and Venue B discussed potential bookings approximately
once per week. But when Venue B opted to go with
Ticketmaster's competitor, Live Nation stopped contacting the
arena about any possible concerts or booking shows at Venue B.
For unrelated reasons, one month later Venue B agreed to
contract with Ticketmaster. Immediately thereafter, Live Nation
began to get "geared back up" to bring concerts to Venue B,
because Venue B was "back in the family."

145. Third, Live Nation and Ticketmaster twice violated the Anti-
Conditioning Provision "by threatening to blacklist Venue C from all future Live
Nation shows after Venue C decided to contract with Ticketmaster's competitor for
primary ticketing services." The DOJ explained:

According to a Venue C executive, Ticketmaster's President
warned the executive that if Venue C went with a competing
ticketer, Ticketmaster's response "would be 'nuclear'" and
"though he would deny it if I repeated it, Live Nation would
never do a show in our building, that they would find other places
for their content . . . ." Following a conversation with
Ticketmaster's President, a second Venue C executive reported
that Ticketmaster and Live Nation "will not do any business
whatsoever with our stadium" and that Ticketmaster was

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"drawing a line in the sand and picking this as their 'hill to die on.'" The Venue C executive went on to state his understanding that Venue C was "now on 'the black list.'"

146.  Fourth, "a senior Ticketmaster executive in charge of Sports for NBA and NHL Arenas threatened to withhold concerts at Venue D if Ticketmaster was not selected as its primary ticketing provider," thereby violating the 2010 Consent Decree:

> In September 2018, Venue D began evaluating primary ticketing providers in advance of the expiration of its Ticketmaster contract. When Venue D told Ticketmaster that it was considering other primary ticketers, Ticketmaster's executive told Venue D that if it chose another primary ticketer, its Live Nation concert volume would be put at risk because Live Nation concerts would either skip the market altogether or play at another venue. Later, the senior executive reiterated his threat if that [sic] Venue D went with another primary ticketing provider, Live Nation would pull concerts from Venue D and reduce the volume of shows held there.

> Despite receiving a competitive bid from a Ticketmaster competitor, Venue B determined that the risk of contracting with a ticketer other than Ticketmaster was too great. Venue D renewed its contract with Ticketmaster for primary ticketing services.

147.  Fifth:

> [Live Nation and Ticketmaster] violated the Final Judgment by threatening to condition Venue E's access to Live Nation concerts on the selection of Ticketmaster as the arena's ticketing provider and then retaliating by withholding Live Nation content after Ticketmaster was not selected. Beginning in early 2012, the President of Live Nation Arenas threatened on multiple occasions to divert Live Nation concerts away from Venue E if it did not select Ticketmaster as its primary ticketer. After Venue E did not select Ticketmaster, two Live Nation executives – the President of Live Nation Arenas and the local Live Nation President in charge of placing concerts in the region – repeatedly

75

threatened that Venue E would not get Live Nation shows unless it switched to Ticketmaster.

When Venue E refused to switch to Ticketmaster despite these threats, Live Nation followed through on its threats and retaliated against Venue E by reducing the number of concerts played there. Indeed, between 2011 and 2015, Live Nation shows playing at Venue E dropped by an average of almost fifty percent.

148.   Finally, the DOJ argued that Live Nation and Ticketmaster violated the 2010 Consent Decree by:

Retaliating against Venue F after the arena switched from Ticketmaster to a competing ticketer. Immediately after learning that Venue F had switched ticketers, Ticketmaster's President contacted the local Live Nation President responsible for placing concerts in the region to suggest that Live Nation book more shows at Venue F's nearby rival venue. In the two years following Venue F's move to a Ticketmaster competitor for primary ticketing, Live Nation significantly reduced the number of shows promoted at Venue F in retaliation.

149.   Under the 2020 Amended Judgment, Live Nation is subject to a penalty of $1 million for each future violation. Further violation of the 2020 Amended Judgment will subject Live Nation not only to significant monetary penalties, additional governmental investigations, and regulatory oversight, but also to additional erosion of its already-shaky reputation among its customers and the industries in which it operates.

**H. From 2020 to the Present, Live Nation Continued Pursuing Unlawful Anticompetitive Business Strategies to Increase the Company's Profits and its Executive Compensation with the Board's Knowledge and Support.**

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

150.   In addition to complying with the provisions of the 2020 Amended Judgment, it was mission critical that Defendants ensured that Live Nation complied with *all* federal and state antitrust laws to ensure that the Company could operate in its current structure. Indeed, this was particularly crucial because Live Nation's reputation in the music industry and its anticompetitive strategies had been exposed. As a known serial offender of antitrust laws, Live Nation would face continued scrutiny from the DOJ, FTC, and state agencies, including a potential challenge to unwind the Live Nation-Ticketmaster merger. ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████

**1.     Live Nation continued to acquire its competitors to increase its profits and market dominance with the Board taking no action to ensure those acquisitions complied with U.S. antitrust laws.**

151.   Since 2020, the Company has continued its long-standing practice of acquiring its competition to increase its dominance in violation of U.S. antitrust laws. ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

152.  For example, 

153.

154.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



155. ████████████████████████████████████████████

156.   In 2023, Live Nation acquired a majority stake in Logjam Presents, the leading promoter and venue operator in Montana. Before the acquisition, the Logjam Presents venues used a competing primary ticketer. As with previous acquisitions, Live Nation switched Logjam venues from the competitor to Ticketmaster once its ticketing agreement expired.[36]

157.   In addition, ████████████████████████████████████

---

[36] *Id.* at ¶ 136.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



158.

159.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



160.

161.

162.   Live Nation also continued to build a "top tier festival portfolio through

acquisitions." Live Nation identified the "Proliferation of Festivals" as one of its

81

"Biggest Competitors Threats" because these outdoor shows threatened to "cannibaliz[e] high margin amp shows." In the course of executing this strategy, and to help protect its power and position in amphitheaters, Live Nation acquired several popular and widely attended festivals, including Austin City Limits, Lollapalooza, Electric Daisy Carnival, Bottlerock, Mountain Jam, Shaky Knees, Houston Free Press Summer, Governor's Ball, and others.[37]

163.  ███████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████.

**2.    Live Nation continued to force venues, including large amphitheaters, into exclusive long-term contracts to stifle its competition, while also increasing Ticketmaster's sales.**

164.  Since 2020, Live Nation has continued its anticompetitive business strategy of entering into long-term exclusive booking contracts to increase its control over venues—large amphitheaters in particular. Specifically, over the past few years, Live Nation entered into long-term exclusive booking agreements with more than a dozen large amphitheaters and long-term leases with several additional amphitheaters. "While the specific terms vary from agreement to agreement, these

---

[37] *Id.* at ¶ 137.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

exclusive booking agreements generally provide Live Nation the exclusive right to control which artists may use the venue, cementing Live Nation's ability to reward artists it promotes while locking out artists promoted by third-party competitors. Some agreements also provide Live Nation with some degree of control over other aspects of the venue's operations such as concessions and ticketing."[38]

165.    Live Nation used Ticketmaster's long-term, exclusive agreements with venues to protect its stranglehold on the live concert industry, and on primary ticketing in particular. "These agreements made Ticketmaster the sole provider of primary ticketing services for all or nearly all events held at a venue for multiple years, sometimes as long as 14 years."[39]

166.    "Ticketmaster's exclusive agreements covered more than 75% of concert ticket sales at major concert venues, foreclosing a substantial share of the primary ticketing market from rival ticketers. In 2022 alone, for example, Ticketmaster signed several lengthy deals with major concert venues."[40] Ticketmaster explained clearly its focus on these deals: they were, in Ticketmaster's own words, a "[h]edge against significant improvements by the competition or even a new competitor" because the "client [was] under contract for longer and not able to leave [Ticketmaster] or price the competition's offer into our new deal for an

---

[38] *Id.* at ¶ 138.
[39] *Id.* at ¶ 99.
[40] *Id.* at ¶ 100.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

extended time." In other words, even if a rival ticketer could offer a better price, product, or ticketing experience, a Ticketmaster-exclusive venue was blocked from choosing the rival ticketer for years, often up to a decade.[41]

167.   Ticketmaster also would deny rival ticketers an opportunity to compete when its long-term exclusive agreements expired. Ticketmaster would renew or extend the ticketing agreements before they expired, such that venues would not have to solicit bids at all from rival companies like SeatGeek and AXS. This tactic ensured that Ticketmaster would keep the contract—and would keep the same contractual terms, without any pressure from competitors to improve the terms for the venue. Ticketmaster accomplished this by analyzing top sports leagues and venues to identify "key clients to renew early and ensure continued concert revenue and block SeatGeek." As one internal Ticketmaster presentation from 2021 recognized, "When We Compete with [SeatGeek] on an Open Bid, We Can Lose . . . GM [Gross Margin]/Ticket."[42]

168.   Ticketmaster further used COVID-19 as an opportunity to extend the terms of its existing long-term venue ticketing agreements by one year, before the agreements expired, thereby ensuring that their locked-in venues would renew their contracts early. One venue resisted, telling Ticketmaster that it intended to sign with a rival. In response, Ticketmaster's counsel wrote, "Any effort by [the venue] to

---

[41] *Id*. at ¶ 101.
[42] *Id*. at ¶ 102.

84

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

switch ticketing service providers before [the extension date] would be a breach of contract, and any announced intention to do so would be an anticipatory breach." Moreover, "[i]n a conversation between that venue's CEO and Live Nation executives, Live Nation's CFO indicated that Live Nation would 'drop' the contractual dispute if the venue agreed to enter into a new ticketing contract with Ticketmaster, but not if the venue went with a rival."[43]

169.   Ticketmaster's strategy to renew contracts early not only blocked potential competitors from bidding but also created friction, through legal threats and other costs, to ensure that venues did not even try to pursue a competitive bidding process. The strategy was successful, with Ticketmaster publicly touting its "incredible high renewal rate." Historically, that rate is virtually 100%.[44]

170.   "These strategies [were] part of a deliberate and defensive series of actions and decisions designed to lock up venues, lock out competitors, and hold the industry hostage from innovation and evolution."[45] On one occasion, Ticketmaster weighed the pros and cons of allowing venues or particular concerts in the U.S. to use multiple primary ticketers. Ticketmaster recognized that this could benefit fans by making it "easy to find & purchase tickets anywhere (e.g., [StubHub, SeatGeek], Groupon)" and fans could find "competitively priced tickets across various touch

---

[43] *Id.* at ¶ 103.
[44] *Id.* at ¶ 104.
[45] *Id.* at ¶ 105.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

points."[46] Having multiple ticketers would benefit venues too, as it would "limit risk of unsold inventory, 'pack the house,'" "maximize revenue among primary inventory (reduce resale)," "limit bad PR from resale arbitrage attributed to sell-outs," and "reach new audiences/better know their fans."[47] However, when venues proposed non-exclusive ticketing contracts, Ticketmaster almost always said no, even for events outside the live concerts industry. For example, "after one NHL team requested a non-exclusive ticketing deal, a Ticketmaster executive forwarded that request internally, stating his reaction, 'Protect our Exclusivity for primary of course.' That Ticketmaster contract continued to be exclusive."[48]

> **3. Live Nation continued to threaten customers, rivals and potential competitors with OVG's assistance.**

171.    Since 2020, Live Nation's executives, including Defendant Rapino, have continued using the Company's power and reputation to threaten customers, rivals and potential competitors that dared to compete with it. Moreover, Live Nation's executives continued to use their close relationship with OVG to prevent competition while increasing the Company's profits, and in turn, those executives' compensation.

172.    For example, in 2021, Live Nation threatened to retaliate against a venue that had decided to switch its primary ticketing service from Ticketmaster to

---

[46] *Id.*
[47] *Id.*
[48] *Id.*

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

SeatGeek. The venue—which *The New York Times* has reported was Brooklyn's

Barclays Center—had decided to move to SeatGeek partly because SeatGeek offered

the venue a greater percentage of the secondary ticketing fees.[49]

173.   When Live Nation heard about Barclays Center's decision, a senior

Live Nation executive texted an overt warning to the venue's CEO: "Apparently

seatgeek are telling [nearby venue] and others that they have a contract deal with

you guys already?? Anyways should think about bigger relationship with LN not

just who is writing a bigger sponsorship check [winking face emoji]." A few days

afterward, Rapino emailed the venue's owner, warning that Live Nation "will be

very concerned that seatgeek a secondary provider will be selling our LN artist

tickets when not authorized by the artist."[50]

174.   Barclays Center ultimately decided to make the switch to SeatGeek, at

which point Live Nation began to act on its threats. Live Nation "re-rout[ed]"

concerts to other venues, and the Company's promotions business demanded that

the venue disable secondary ticketing on SeatGeek for all Live Nation-promoted

concerts, which deprived Barclays Center and SeatGeek of secondary fee revenue.[51]

175.   Live Nation eventually allowed the venue to enable secondary ticket

sales, "but only after (a) the venue agreed to split its share of secondary fee revenue

---

[49] *Id.* at ¶ 91.
[50] *Id.* at ¶ 92.
[51] *Id.* at ¶ 93.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

(sourced through SeatGeek) with Live Nation, and (b) SeatGeek agreed to change its ticket-buying interface to make it conform, in some respects, to Ticketmaster's without regard to whether that was what fans or the venue preferred." Specifically, Live Nation required SeatGeek to change the way it distinguished primary and secondary tickets to align with Ticketmaster's interface and to limit the use of SeatGeek's "DealScore" tool, which helped fans identify good secondary ticketing deals. "[B]arely a year into what had been a seven-year contract," the venue "abrupt[ly]" "cancel[ed]" its partnership with SeatGeek" and returned to Ticketmaster, no doubt at least in part because of Live Nation's interventions, which it directed to the venue.[52]

176.  Larry Miller, the director of the music business program at New York University's Steinhardt School of Culture, Education and Human Development," commented on Barclays Center's switch: "It's very rare for such a cancellation. . . . Ticketing platform deals with venue owners are not of short duration. . . . I can't think of a time over the last decade where a major venue has dropped a ticketing platform early on in the deal cycle."

177.  The industry's awareness of Live Nation's anticompetitive tactics, and specifically its tendency to refuse to book shows at venues that do not use Ticketmaster, was so widespread that Live Nation could rely on other intermediaries

---

[52] *Id*. at ¶ 94.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

to deliver its threats for Live Nation's benefit. For example, OVG made such threats to at least one venue. And a rival CEO warned at least one other venue that Live Nation would reroute shows from the venue if it opted to use SeatGeek for primary ticketing services.[53]

178.   Also in 2021, Live Nation's senior-most executives threatened to retaliate against private equity firm Silver Lake unless one of its portfolio companies, TEG, stopped competing with Live Nation for artist promotion contracts in the United States. Specifically, Live Nation's CEO Rapino "complained to Oak View Group's co-founder that TEG was '[f]ull on competitors.'"[54] OVG then told Silver Lake that Live Nation was "not happy" with Silver Lake's investment in TEG. Rapino then complained to Silver Lake directly, stating, "I am all in on [OVG] where the big play lies with venues – why insult me with this investment in ticketing/promotions etc."[55]

179.   Later in 2021, Live Nation learned that TEG had made offers to prominent artists in the U.S. Live Nation executives were concerned that "[TEG] will be everywhere" and "will hunt big names." When TEG secured a prominent artist for a concert at the Los Angeles Coliseum, Live Nation then used Ticketmaster's exclusive ticketing deal with the venue to hamstring the event. TEG

---

[53] *Id*. at ¶ 95.
[54] *Id*. at ¶ 83.
[55] *Id*. at ¶ 83.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

had contracted to sell a certain number of tickets to the concert on StubHub. However, because Ticketmaster was the exclusive ticketer for all shows at the venue, Live Nation "threat[ened] not to honor any of those tickets" and told TEG either to "unwind" its deal with StubHub or transfer the ticketing proceeds to Ticketmaster. A Ticketmaster executive said, "if TEG [thinks] they can come into [North America] and take whatever they want off our platform we will have a massive problem." StubHub succumbed to the threat—it stopped selling tickets and tried to work with Ticketmaster to fulfill the tickets that it had already sold. But Ticketmaster did not fulfill many of those tickets to StubHub's customers, hundreds of whom were unable to enter the event.[56]

180.  After hearing about the TEG concert, Rapino again threatened Silver Lake, TEG, and OVG, stating that he "fail[ed] to understand" why Silver Lake "continue[d] to invest in a business that competes with LN/OVG . . . ." Live Nation threatened to withdraw its support from OVG and instead support one of its competitors unless TEG stopped competing with Live Nation in the U.S.:

> I can assure you the OVG investment is a much bigger win than T[E]G . . . LN declared to back OVG vs other developers or going solo and it's been a huge win for both sides– we have over 20 global arenas in development that neither could do without the other . . . do you really want LN backing [AEG's venue development and management company] . . . ? Seems like a dumb trade off??[57]

---

[56] *Id*. at ¶ 84.
[57] *Id*. at ¶ 85.

90

181.   Irving Azoff, the "powerful artist manager" and OVG's cofounder, who refused to allow TEG to promote any of his large roster of artist clients, then told Live Nation that he was going to demand that Silver Lake sell TEG. Rapino responded to Azoff, "Love ya."

182.   Soon after this exchange, TEG stopped competing for concert promotion services in the U.S. Silver Lake now seems "intent on dumping teg" and has inquired, via OVG's cofounder, whether Live Nation would be interested in purchasing TEG.[58]

183.   Similarly, in 2022, Defendant Rapino again complained to OVG's CEO after learning that OVG made an offer to promote another artist: "who would be so stupid to do this and play into [the artist agent's] arms"? OVG's CEO again relented: "We have never promoted without you. Won't." OVG's CEO later told Rapino that he was "[m]ore than happy to do these deals thru LN as I have always been aligned," and that "I never want to be competitors."[59]

184.   Live Nation has also exploited its relationship with OVG to strongarm venues to switch to Ticketmaster, further entrenching Ticketmaster's power and market share. For example, in 2022, Live Nation and OVG entered into a long-term ticketing services agreement. Pursuant to the agreement, Ticketmaster became the exclusive primary ticketer for the five venues that OVG owned and required OVG

---

[58] *Id*. at ¶ 87.
[59] *Id*. at ¶ 74.

91

to "advocate for" the more than 100 venues it manages to adopt exclusive agreements with Ticketmaster for their ticketing services. The agreement applied to all venues that OVG owned or managed in the future.[60]

185.   For venues that OVG manages that already have exclusive ticketing agreements with Ticketmaster, the agreement required OVG to encourage the venues to extend those agreements on their existing terms, with Ticketmaster's portion of the per-ticket service fee for primary tickets increasing annually. For venues not currently using Ticketmaster, the agreement required OVG to encourage them to enter into exclusive Ticketmaster agreements with predetermined standard financial terms. These terms included "fee splits for primary ticket sales that are generally less favorable for the venues than their current ticketing contracts."[61] Even so, the agreement required OVG to push these new contracts, instead of using the typical ticketer selection process that OVG runs for its clients.

186.   As venue manager, OVG also decided which non-incumbent ticketing services were invited to submit bids for ticketing service proposals, and often only invited Ticketmaster, thereby eliminating one of the few opportunities rival ticketers had to compete against Ticketmaster. As OVG's CEO explained to Rapino, the deal "allows us to tie up all Owned and Operated facilities to 10 year deals, develop a

---

[60] *Id.* at ¶ 78.
[61] *Id.* at ¶ 79.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

standard A and B market deal for all future projects and to convert all OVG 360 deals to TM now or as they expire for 10 years . . . Appreciate the consideration and partnership and all of us will work diligently on this so we are always aligned with TM."[62]

187. Live Nation has paid OVG for its "advocacy" with a substantial "incentive payment," plus significant annual payments. These incentives allowed OVG to share in Ticketmaster's monopoly profits, which it helped protect. OVG predicted that the agreement would cause at least 22 venues to switch to Ticketmaster over the next four years, and in 2023, OVG converted six venues to Ticketmaster.[63]

188. Nor were Live Nation's biggest competitors immune from Live Nation's threats. Live Nation's principal competitor, AEG, owns approximately 30% of Anschutz Spectacor Management ("ASM Global"), a venue management company that manages more than 30 arenas in the U.S. ASM Global was created by a 2019 merger between AEG Facilities and Spectacor Management Group ("SMG"). Before the merger, SMG's legacy venues used Ticketmaster as their exclusive primary ticketer, and AEG Facilities' legacy venues used AXS. Through its minority interest in ASM Global, AEG advocated for ASM Global to have its venues use AXS as the exclusive primary ticketer. But ASM Global's majority shareholder

---

[62] *Id.*
[63] *Id.* at ¶ 80.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

1    Onex was concerned that Live Nation would retaliate against ASM Global for

2    switching all its venues to Ticketmaster by withholding shows from ASM Global

3
     venues.[64]
4

5        189.    Ultimately, AEG was forced to relent and allow Ticketmaster to remain

6
     the dominant provider at ASM Global venues, even though AEG partly owned ASM
7
8    Global and could provide an alternative option to Ticketmaster, because it could not

9    risk avoiding losing access to Live Nation concerts by "alienating" Live Nation.

10
     AEG agreed that Ticketmaster would remain the default primary ticketer for most
11
12   ASM Global venues, though AEG could use AXS for events that AEG promoted.[65]

13       190.    Live Nation's threats, combined with the Company's other

14
     anticompetitive strategies like long-term exclusive agreements, a history of
15
16   retaliation, and other exclusionary conduct, prevented venues and artists from

17   choosing ticketers based on their objective qualities, like price, quality, or venue.

18
     Venues and artists, therefore, were "not free to choose a ticketer based on the best
19
20   technology, or most favorable contract terms, or simply what works best for them

21   or—importantly—what works best for the fans that fill venues to see their favorite

22
     artists." Instead, Live Nation used its anticompetitive business strategies to solidify
23
24   its dominance in promotions and ticketing, which it deployed with its extensive

25

26

27   _____

     [64] *Id*. at ¶ 96.
28   [65] *Id*. at ¶ 97.

94

network of venues, to constrain the choices of venues, artists, fans, competitors, and other stakeholders in the live concert industry.[66]

191. Live Nation agreed to allow certain ASM Global venues to use AXS for AEG-promoted shows as part of its recent contract negotiation in order to dislodge AXS, its largest ticketing rival, from the very venues that AEG, its largest promotions rival, partially owns. However, a Ticketmaster executive stated internally: "[i]t's not something we would do for another client." "If even AEG must acquiesce to Live Nation's demands that Ticketmaster exclusively ticket every show at AEG's own affiliated venues—save those shows promoted by AEG—no other major concert venue owner stands a chance." Indeed, when other clients who did not own a competitive ticketer or promoter asked for a similar arrangement, Ticketmaster "shot it down as a non-starter."[67]

192. Allowing venues to use multiple ticketers would benefit fans and the industry as a whole, but not Ticketmaster and Live Nation. One Ticketmaster executive noted that "[o]pen is WAY more attractive as a competitor strategy, not as an incumbent." Rather, for Ticketmaster, exclusivity allowed it to unlawfully protect its already high market share in the U.S. and solidify its monopoly, which grew Ticketmaster's profits, and in turn, Live Nation's.[68]

---

[66] *Id.* at ¶ 98.
[67] *Id.* at ¶ 106.
[68] *Id.* at ¶ 107.

95

4. **Live Nation Continued to Increase its Control in the Secondary Ticketing Market Through its Anticompetitive Practices**

193. ██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

194. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

195. Similarly, ██████████████████████████
████████████████████████████████████████

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



196. Likewise,

197.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



198.

I.

199.

200.   For example,

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

201. Similarly, 

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



202.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



203.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

204. Significantly, ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

205. Similarly, ██████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

206. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

[REDACTED]

207.    Less than a month later, on November 18, 2022, *The New York Times* reported that the DOJ was investigating the Company for antitrust violations. The article explained that the investigation "focused on whether Live Nation Entertainment ha[d] abused its power over the multibillion-dollar live music industry." The article further explained: "That power has been in the spotlight after Ticketmaster's systems crashed while [Taylor] Swift fans were trying to buy tickets in a presale for her tour, but the investigation predates the botched sale, [two people with knowledge of the matter] said. Members of the antitrust division's staff at the Justice Department have in recent months contacted music venues and players in the ticket market, asking about Live Nation's practices and the wider dynamics of the industry, said the people, who spoke on the condition of anonymity because the investigation is sensitive. The inquiry appears to be broad, looking at whether the company maintains a monopoly over the industry, one of the people said".

208.    This article stated that members of the DOJ's staff have asked whether Live Nation is complying with the [2020 Amended Judgment] as part of their new inquiry. In addition, officials at the DOJ have grown increasingly wary of such settlements, believing the best way to settle antitrust concerns is through changes to a company's structure.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

209.    On November 18, 2022, Live Nation released a statement in response to the news of the DOJ's antitrust investigation, stating:

> As we have stated many times in the past, Live Nation takes its responsibilities under the antitrust laws seriously and does not engage in behaviors that could justify antitrust litigation, let alone orders that would require it to alter fundamental business practices . . .
>
> Ticketmaster has a significant share of the primary ticketing services market because of the large gap that exists between the quality of the Ticketmaster system and the next best primary ticketing system. The market is increasingly competitive, nonetheless, with rivals making aggressive offers to venues. That Ticketmaster continues to be the leader in such an environment is a testament to the platform and those who operate it, not to any anticompetitive business practices.
>
> Secondary ticketing is extremely competitive, with Ticketmaster competing with StubHub, SeatGeek, Vivid and many others. No serious argument can be made that Ticketmaster has the kind of market position in secondary ticketing that supports antitrust claims. For the past 12 years Live Nation has operated under a Consent Decree that among other things seeks to prevent anticompetitive leveraging of Live Nation promoted content to advantage Ticketmaster. Pursuant to the Amended Decree voluntarily entered in 2020, Live Nation's compliance is monitored by a former federal judge. There was never has been and is not now any evidence of systemic violations of the Consent Decree. It remains against Live Nation policy to threaten venues if they won't get Live Nation shows if they do not use Ticketmaster, and Live Nation does not re-route content as retaliation for a lost ticketing deal.

210.    Notably, in the Securities Class Action, when the court denied defendants' motion to dismiss, it found that the statement that "Ticketmaster has a significant share of the primary ticketing services market because of the large gap that exists between the quality of the Ticketmaster system and the next best primary

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

ticketing system" was materially misleading because it omitted material information concerning the Company's dominance in the live entertainment market, including its use of exclusive agreements with venues for as long as ten years.

211.  The announcement of the DOJ's investigation, as well as the public outcry following the chaos of the Taylor Swift ticket sales, also caught the attention of Congress. On November 22, 2022, U.S. Senators Amy Klobuchar and Mike Lee announced that the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights would "hold a hearing to examine the lack of competition in the ticketing industry."

**J. Live Nation Faces a Congressional Inquiry and DOJ Investigation Related to its Monopolistic Business Strategies.**

212.  ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

213.   On January 24, 2023, the Committee held the hearing, at which Defendant Berchtold and other industry participants testified. At the hearing, Berchtold tried to obscure Live Nation and Ticketmaster's continued dominance in the primary ticketing market.

214.   Later in the hearing, in response to a question from Senator Klobuchar, Defendant Berchtold testified that there were "a variety of ways of estimating the market share in the industry," and that "[d]epending on what you include, we believe our market share would be somewhere between the 50 and 60 percent range." Berchtold did not specify what was included in his market definition, making this comment unclear and misleading, particularly given Live Nation's control over arenas and amphitheaters in the U.S. Berchtold objected to the 80% market share figure as being out of date, contending that it came from a 2008 DOJ study. A 2018 Government Accountability Office report noted that the DOJ based the 80% market share estimate "on the number of major concert venues Ticketmaster served at the time." In the years since, Live Nation and Ticketmaster have grown substantially, and now maintain control or influence over far more venues than they did in 2008.

215.   ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

1

2

3

4

5

6    216.   A day letter, on February 22, 2023, Senators Klobuchar and Lee sent a

7

8    letter to the DOJ's Assistant Attorney General for Antitrust, Jonathan Kanter,

9    "calling on the [DOJ] to continue examining . . . the 'anticompetitive conduct' of

10   Ticketmaster and its parent company, Live Nation." The letter explained that, "other
11
     than Live Nation's executive, every witness at our hearing"—an artist, an executive
12

13   at a secondary market ticketing company, a promoter, and industry experts—

14   "testified that Live Nation is harming America's music industry." The letter listed
15
16   as examples:

17        •    The Founder and CEO of Seat Geek testified that
18             Ticketmaster now uses even longer exclusive agreements
               with venues, in some instances as long as ten years.
19
20        •    Clyde Lawrence, lead singer in the band Lawrence,
               testified that on a $30 ticket, Live Nation adds $12 in fees,
21             and of that $42 price the customer pays, only $12 goes to
22             the band before accounting for its cost of the tour.

23        •    A competing promoter, Jam Productions, testified that
24             Live Nation attempts to lock up talent so competitors
               cannot produce concert tours. He also noted that 87
25             percent of Billboard's Top 40 Tours in 2022 were ticketed
               by Ticketmaster in the U.S. and that Ticketmaster has
26             exclusive ticketing contracts for more than 85 percent of
27             the nation's NFL, NHL, and NBA teams. (While Live

28

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

Nation contested the accuracy of this data, it failed to provide any alternative data.)

- A public policy expert at the James Madison Institute testified that Ticketmaster's market dominance allows it to harm consumers through charging service fees and demanding exclusivities. In particular, he noted that the service fees can be greater than 30 percent and "are tacked on at the very end of the process, on the very last screen before purchasing," raising questions about the deceptive pricing strategies.

- A former DOJ lawyer testified that the conduct remedies in the 2010 Consent Decree from the Live Nation-Ticketmaster merger investigation have failed and that such failures constitute hard evidence of the firm's monopoly power. She also testified that "the company still has the power to silence market participants who fear its retaliation."

217.    Senators Klobuchar and Lee also wrote that they "asked Live Nation a number of questions about competition both at the hearing and afterwards, but it has largely failed to answer them." Specifically:

We asked how many concerts per year were both promoted by Live Nation and ticketed by Ticketmaster, and the company said (without having asked for an extension of time) that it was "unable to determine" the answer "in the time available." We asked Live Nation to tell us for how many of the top 100 arenas Live Nation provides ticketing services, and the company provided no response. We asked how many venue contracts Ticketmaster lost to competitor Paciolan in recent years, and the company provided no response. We asked whether Live Nation has entered into any agreements with venues where the contract term for ticketing services is longer than five years, and the company provided no response. We also asked Live Nation if it would commit to having third party audits to confirm that it is neither threatening to retaliate or actually retaliating against venues that select other ticketing services providers after the

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

consent decree expires. Live Nation refused to do so. Instead, it said "Live Nation does not need to be subject to a consent decree or any similar legal obligation to refrain from retaliating against a venue for using another company's ticketing services, and from threatening to retaliate for such choosing of another ticketing company."

218.   Senators Klobuchar and Lee continued, "Live Nation's responses amount to 'trust us.' We believe that is wholly insufficient."

219.   On February 23, 2023, Live Nation issued a response stating, "In the last few weeks alone, we've submitted more than 35 pages of information to provide greater context and transparency to policymakers on the realities of the industry." However, a mere 35 pages in response to the serious questions raised and the lack of sufficient answers provided, as noted by Senators Klobuchar and Lee, suggests that Live Nation's Board and officers decided to stonewall the Senate's investigation in an attempt to hide the Company's unlawful anticompetitive business practices.

220.   

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

221. 

222.    On July 28, 2023, *Politico* reported that the DOJ "could file an antitrust lawsuit against [Live Nation and Ticketmaster] by the end of the year, according to three people with knowledge of the matter." According to the report, the DOJ complaint was expected to allege that "the entertainment giant is abusing its power over the live music industry."

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

223.   On May 23, 2024, "[t]he [DOJ] and dozens of states and the District of Columbia sued to break up Ticketmaster and . . . Live Nation," "alleging that they have illegally monopolized the live music industry harming fans, artists and venues, through a mix of exclusive contracts, self-preferencing, retaliation and acquisitions."

**K. The Company's Profits Grow From 2022-2024 Due to Unlawful Anticompetitive Actions.**

224.   Due at least in part to Live Nation's unlawful anticompetitive business practices, the Company saw significant financial results.

225.   In 2022, Live Nation's consolidated revenue increased by $10.4 billion, from $6.3 billion in 2021 to $16.7 billion in 2022. Consolidated AOI increased by $1.1 billion, from $324 million in 2021 to $1.4 billion in 2022. Live Nation's Concerts segment saw revenue grow by $8.8 billion and AOI increase by $391 million; Ticketing saw revenue grow by $1.1 billion and AOI increase by $407 million; and Sponsorship & Advertising saw revenue grow by $556 million and AOI increase by $350 million.

226.   In 2023, Live Nation's overall revenue increased by $6.1 billion, or 36%, to $22.7 billion. Operating income grew by $334 million, or 46%, to $1.1 billion in 2023, and consolidated AOI increased by $455 million, or 32%, to $1.9 billion. The Concerts segment saw revenue grow by $5.3 billion and AOI increase by $156 million; Ticketing saw revenue grow by $721 million—from $2.2 billion to

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

$3.0 billion—and AOI increase by $288 million; and Sponsorship & Advertising saw revenue grow by $127 million and AOI increase by $83 million.

227.   In 2024, Live Nation "surpassed" 2023's "record" "revenue results." Overall revenue increased by $429 million, and consolidated AOI increased by $265 million. The Concerts segment saw revenue grow by $283 million and AOI increase by $209 million; Ticketing saw revenue grow by $29 million and AOI decrease by $16.5 million; and Sponsorship & Advertising saw revenue grow by $100 million and AOI increase by $89 million.

228.   With the Company collecting roughly $23 billion in revenue in 2024, Defendants have each implemented, authorized, and/or approved a business plan for Live Nation whereby it has "a hand in nearly every corner of the industry."

**L. Relying on Unlawful Anticompetitive Actions to Increase the Company's Profits in Turn Increased the Compensation of the Officer Defendants.**

229.   Defendant Rapino's and other Live Nation executives' compensation has grown along with the Company. Rapino's base salary as the Company's President and CEO when Live Nation was spun off in 2005 was $550,000 per year. By 2024, his base salary had climbed to $3,000,000.

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| 2024 | 3,000,000 | | 9,799,557 | | 18,483,407 | 1,677,773 | 32,960,737 |
| 2023 | 3,000,000 | | | | 18,700,000 | 1,738,317 | 23,438,317 |
| 2022 | 3,000,000 | 6,000,000 | 116,741,758 | | 12,000,000 | 1,263,807 | 139,005,565 |

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|------|-----------|-----------|------------------|-------------------|--------------------------------------------|----------------------------|-----------|
| 2021 | 2,562,500 |           | 10,584,334       |                   |            | 695,630 | 13,842,464 |
| 2020 | 1,662,500 |           | 2,902,991        |                   |            | 216,019 | 4,781,510 |
| 2019 | 3,000,000 |           |                  |                   | 11,400,000 | 163,122 | 14,563,122 |
| 2018 | 3,000,000 |           |                  |                   | 8,400,000  | 191,603 | 11,591,603 |
| 2017 | 2,416,667 | 1,000,000 | 58,631,538       | 1,720,677         | 6,766,667  | 80,211  | 70,615,760 |
| 2016 | 2,300,000 |           | 574,992          | 1,959,351         | 5,520,000  | 83,898  | 10,438,241 |
| 2015 | 2,300,000 |           | 1,266,500        | 1,250,555         | 5,060,000  | 83,324  | 9,960,379 |
| 2014 | 2,300,000 |           | 3,135,000        |                   | 5,520,000  | 81,112  | 11,036,112 |
| 2013 | 2,300,000 |           | 1,753,500        |                   | 4,830,000  | 52,119  | 8,935,619 |
| 2012 | 2,200,000 | 243,281   | 2,595,000        | 18,994,846        | 4,400,000  | 46,406  | 28,479,535 |
| 2011 | 2,001,852 |           | 2,673,427        | 2,431,848         | 4,800,000  | 37,219  | 11,944,346 |
| 2010 | 1,973,585 | 3,000,000 | 5,366,935        | 1,653,217         | 3,780,000  | 87,415  | 15,861,152 |
| 2009 | 1,501,150 |           | 412,500          | 2,086,221         | 2,625,000  | 51,362  | 6,676,223 |
| 2008 | 1,001,150 |           | 1,849,500        |                   | 1,950,000  | 42,885  | 4,843,525 |
| 2007 | 950,700   | 1,000,000 | 10,125,000       | 8,725,485         |            | 38,106  | 17,839,291 |
| 2006 | 636,083   |           | 223,022          | 340,517           |            | 12,120  | 1,211,742 |

230.   The "Non-Equity Incentive Plan Compensation" amounts refer to cash performance bonuses that the executives earned based on Live Nation's achievement of pre-established financial performance targets, typically in AOI. The Company has met these targets, and the executives have received their bonuses, nearly every year since Live Nation was spun off from Clear Channel. The only years that the Company did not hit the performance targets were 2006, the first full fiscal year after

113

Live Nation was spun off from Clear Channel, and 2020 and 2021, when live entertainment was largely shut down due to the COVID-19 pandemic. (For 2007, the cash incentive performance bonus was listed in the "Bonus" column.)

231.    Defendant Berchtold, the Company's CFO, also saw his base salary and cash incentive performance bonus increase from 2012, when he joined Live Nation, to 2024. Notably, in 2023, his compensation of over $52 million, made him the highest paid CFO in the U.S.

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| 2024 | 2,000,000 | | | | 4,349,037 | 74,935 | 6,423,972 |
| 2023 | 2,000,000 | | | | 4,400,000 | | 6,485,940 |
| 2022 | 1,300,000 | 6,000,000 | 42,401,504 | | 2,600,000 | | 52,356,095 |
| 2021 | 1,108,645 | | 3,804,450 | | | | 5,036,916 |
| 2020 | 799,596 | | 628,988 | | | 73,049 | 1,501,633 |
| 2019 | 1,300,000 | | | | 2,600,000 | 126,441 | 4,026,441 |
| 2018 | 1,300,000 | | | | 2,600,000 | 108,471 | 4,008,471 |
| 2017 | 1,100,000 | | 25,686,219 | 822,930 | 1,100,000 | 85,340 | 28,794,489 |
| 2016 | 1,100,000 | | 275,009 | 937,081 | 1,100,000 | 54,889 | 3,466,979 |
| 2015 | 1,100,000 | | 139,315 | 370,189 | 1,100,000 | 23,993 | 2,733,497 |
| 2014 | 1,100,000 | | 3,135,000 | 6,738,989 | 1,100,000 | 32,471 | 12,106,460 |
| 2013 | 750,000 | | 235,179 | 696,320 | 750,000 | 14,097 | 2,445,596 |
| 2012 | 666,250 | | 314,392 | | 666,250 | | 1,646,892 |

232.    Defendant Capo's compensation was first publicly reported in 2013 when he became a named executive officer as the Company's Chief Accounting Officer. Since then, he has regularly received cash incentive performance bonuses

114

tied to Live Nation's Adjusted Operating Income, aside from 2020 and 2021, as well as a discretionary bonus in 2014 of $60,000 "in recognition of his efforts and contributions in connection with the company's high level of acquisition activity."

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| 2024 | 450,000 | | 226,743 | | 225,000 | | 901,743 |
| 2023 | 425,000 | | 152,523 | | 137,000 | | 715,023 |
| 2022 | 425,000 | | | | 137,000 | | 562,250 |
| 2021 | 336,995 | 350,000 | 207,925 | | | | 895,920 |
| 2020 | 283,227 | | 121,520 | | | | 404,474 |
| 2019 | 354,500 | | 85,155 | | 177,250 | | 616,905 |
| 2018 | 344,000 | | 66,075 | | 172,000 | | 582,075 |
| 2017 | 335,000 | | 72,575 | | 134,000 | | 541,575 |
| 2016 | 315,200 | | | | 94,560 | | 409,760 |
| 2015 | 307,500 | | 50,660 | 50,164 | 92,250 | | 500,574 |
| 2014 | 300,000 | 60,000 | | | 90,000 | | 450,000 |
| 2013 | 280,000 | | | | 84,000 | 11,000 | 375,000 |

233.   Defendant Hopmans has received cash incentive performance bonuses each year since he became a named executive officer as the Company's Executive Vice President, Mergers and Acquisitions and Strategic Finance, except for 2021, when Live Nation was still addressing COVID-19's impact on the business.

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| 2024 | 1,500,000 | | | | 1,500,000 | 12,980 | 3,012,980 |

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| 2023 | 981,725 | | 21,392,825 | | 981,725 | 11,005 | 23,367,280 |
| 2022 | 981,725 | | 3,706,691 | | 981,725 | | 5,670,141 |
| 2021 | 838,557 | | 145,566 | | | | 984,123 |

234.    Finally, Defendant Rowles, the Company's General Counsel, has also received cash incentive performance bonuses nearly every year since Live Nation was spun off from Clear Channel. His base salary has grown from $321,282 in 2006 to $1,100,000.

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| 2024 | 1,100,000 | | | | 1,650,000 | 31,954 | 2,781,954 |
| 2023 | 1,100,000 | | | | 1,650,000 | 78,768 | 2,828,768 |
| 2022 | 800,000 | | 5,495,096 | | 800,000 | 52,489 | 7,147,585 |
| 2021 | 683,333 | | 368,730 | | | 54,212 | 1,106,275 |
| 2020 | 493,333 | | 243,040 | | | 11,559 | 747,932 |
| 2019 | 800,000 | | 204,372 | 208,608 | 800,000 | 37,082 | 2,050,042 |
| 2018 | 800,000 | | 196,023 | 200,992 | 800,000 | 28,760 | 2,025,775 |
| 2017 | 750,000 | | 1,289,643 | 561,095 | 750,000 | 15,284 | 3,366,022 |
| 2016 | 750,000 | | 187,502 | 638,916 | 750,000 | 24,878 | 2,351,296 |
| 2015 | 750,000 | | | 175,944 | 750,000 | 19,148 | 1,795,092 |
| 2014 | 750,000 | | 522,500 | 898,532 | 750,000 | 16,260 | 2,937,292 |
| 2013 | 667,013 | | 283,658 | 247,708 | 667,013 | | 1,865,392 |
| 2012 | 635,250 | | 299,766 | | 635,250 | | 1,570,266 |
| 2011 | 579,353 | 28,875 | 117,832 | 200,415 | 577,500 | | 1,503,975 |

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|------|-----------|-----------|------------------|-------------------|--------------------------------------------|----------------------------|-----------|
| 2010 | 578,474 | 500,000 | 3,801,727 | 560,772 | 513,975 | | 5,954,948 |
| 2009 | 517,475 | | | | 550,000 | | 1,067,475 |
| 2008 | 500,706 | | -344,500 | | 425,000 | | 581,206 |
| 2007 | 950,700 | 1,000,000 | 400,613 | 209,722 | | | 1,375,789 |
| 2006 | 636,083 | | 104,517 | | 200,000 | 800 | 626,689 |

## V.   THE PROXY DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9 BY CAUSING THE COMPANY TO FILE MATERIALLY FALSE OR MISLEADING PROXY STATEMENTS

235.   The Proxy Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Live Nation to issue proxy statements in 2022, 2023, and 2024 that included materially false or misleading representations about the sufficiency of the Company's antitrust compliance controls and the reasons for awarding the Company's executive officers massive incentive-based bonuses.

### A. The 2022 Proxy Defendants Caused Live Nation to Issue the Materially False or Misleading 2022 Proxy.

236.   On April 27, 2022, Director Defendants Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Rapino, Walden, and Watkins (collectively with Officer Defendants Berchtold and Capo, the "2022 Proxy Defendants") caused Live Nation to file the 2022 Proxy Statement (the "2022 Proxy") in connection with the 2022 annual stockholders meeting to be held on June 16, 2022. In the 2022 Proxy, the 2022 Proxy Defendants solicited stockholders'

117

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

votes to, among other things, to re-elect the eleven (11) director nominees, who were the eleven incumbent Director Defendants to hold office until the 2023 Annual Meeting of Stockholders. With respect to this solicited vote, the 2022 Proxy Defendants issued materially false or misleading statements.

237.    The 2022 Proxy incorporated by reference the Company's 2021 Form 10-K (the "2021 10-K"), which was filed with the SEC on February 23, 2022 and signed by Defendants Rapino, Berchtold, Capo, Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Walden, and Watkins, as part of the materials that Live Nation stockholders relied upon to cast their votes at the Company's annual 2022 stockholder meeting. Notably, in the Securities Class Action, the court specifically found the following statement in the 2021 10-K was false and misleading when denying the defendants' motion to dismiss. In this regard, the 2021 10-K falsely stated:

> Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences....

> We believe that barriers to entry into the promotion services business are low and that certain local promoters are increasingly expanding the geographic scope of their operations.

> We experience competition for other national, regional and local primary ticketing service providers to secure new venue clients and to reach fans for events.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that could enter these markets.

238.   In the Securities Class Action, the Court found this statement in the 2021 10-K to be false and misleading because the 2021 10-K failed to include specific facts and details about Live Nation's presence and control of the live entertainment industry. For example, the 2021 10-K omitted that Live Nation controls 60% of concert promotion services, and that competitors must have the ability to pay substantial up-front costs to actually compete in the market. As the Court explained, these omissions made the Company's claims about an "intense[ly]" competitive market and success based predominantly "on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences" materially misleading because they create an impression of a state of affairs at Live Nation that differed in a material way from the one actually existing. As a consequence of the 2021 10-K's incorporation by reference into the 2022 Proxy, Live Nation's shareholders relied on false and misleading material information when casting their votes for the 2022 annual meeting.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

239.   The 2022 Proxy also contained false and misleading statements that created the impression that Live Nation had internal controls and risk management systems to ensure the Company's compliance with antitrust laws, when it did not, resulting in the 2022 Proxy creating an impression of a state of affairs at Live Nation that differed in a material way from the one actually existing. For example, the 2022 Proxy represented in a section entitled "CORPORATE GOVERNANCE" that "[w]e are committed to maintaining high standards of business conduct and corporate governance, which we believe are essential to running our business efficiently, serving our stockholders well and maintaining our integrity in the marketplace." Similarly, in a section entitled "Supporting Ethics and Compliance," the 2022 Proxy stated that "We are actively engaging in efforts globally to ensure that ethics and compliance are embedded across our business . . . ."

240.   The 2022 Proxy described the Audit Committee's key role in risk oversight for the Board, including the Company's compliance with antitrust laws and its compensation policies and practices. The 2022 Proxy stated that "the Audit Committee's purpose is to assist the board of directors in its general oversight of the quality and integrity of our…internal control practices." Specifically, the 2022 Proxy represented that the Board's Audit Committee "periodically reviews our policies and practices with respect to risk assessment and risk management, including discussing with management our major risk exposures and the steps that have been taken to monitor and control such exposures. The Audit Committee reports the results of its

120

review to the board of directors." The 2022 Proxy also informed stockholders that "[t]he specific responsibilities of the Audit Committee include" "reporting regularly to the full board of directors regarding, among other things,…compliance with legal or regulatory requirements," "discussing guidelines and policies with respect to risk assessment and risk management," and "oversight responsibility for areas such as . . . compliance with laws and regulations . . . ."

241.  The 2022 Proxy further represented that:

> Matters of risk management are brought to the attention of the Audit Committee by our President and Chief Executive Officer, our President and Chief Financial Officer, our General Counsel, our Chief Accounting Officer, our external auditors and our Senior Vice President of Governance, Risk & Compliance, who regularly reviews and assesses internal processes and controls for ongoing compliance with internal policies, as well as for potential weaknesses that could result in a failure of an internal control process. Management reviews and reports on potential areas of risk at the request of the Audit Committee or other members of the board of directors, including . . . compliance with laws and regulations.

242.  In short, the 2022 Proxy falsely and misleadingly informed Live Nation's stockholders that the Company maintained internal controls and risk management systems, including the Board, with the Audit Committee having primary oversight, actively working to mitigate significant risks to the Company, and ensure the Company's legal and regulatory compliance, including with U.S. antitrust laws. The 2022 Proxy was materially false and misleading when made, because it, among other things, omitted any disclosures regarding Live Nation's

anticompetitive business practices in the U.S., which exposed Live Nation to serious and significant regulatory and legal risks. The Proxy falsely and misleadingly omitted that the Individual Defendants had engaged in anticompetitive actions in violation of the 2010 Consent Decree, which had resulted in the Company's agreement to the 2020 Amended Judgment, extending the original decree for five more years and adding additional requirements on the Company.

243.    Indeed, by the time the 2022 Proxy was filed, Live Nation's pattern of engaging in anticompetitive actions included: (i) acquiring or entering into joint ventures and other contractual agreements with potential competitors and nascent threats to neutralize any competition; (ii) threatening and intimidating, directly or through intermediaries, rivals, venues, and other potential threats, and otherwise pressuring them, to blunt expansion into U.S. concert promotions and protect and increase Ticketmaster's dominance; (iii) colluding with OVG to avoid competition in the concert promotions market; (iv) conditioning artists' access to Live Nation's large network of amphitheaters and other venues on choosing Live Nation as the promoter, which enables the Company to expand its control over artists and third-party venues; (v) using exclusive long-term contracts with venues; and (vi) using anticompetitive tactics to increase Live Nation's market share in the secondary ticketing market. Moreover, by this time, multiple media outlets had reported on the Company's anticompetitive activities. Consequently, the 2022 Proxy created a misleading impression of Live Nation's internal controls and risk management

systems that differed in a material way from the ones actually existing at the Company.

244.   The 2022 Proxy, which included by reference the 2021 10-K, harmed Live Nation by interfering with the proper governance on its behalf that follows its stockholders' informed voting of directors. As a result of the false and misleading statements in the 2022 Proxy and 2021 10-K, Live Nation stockholders voted to re-elect eleven (11) incumbent Director Defendants to the Board. Had Live Nation stockholders known the truth, they would not have re-elected Live Nation's eleven incumbent directors and would have instead worked to elect directors who would have worked to prevent or mitigate the harm to the Company giving rise to this action.

**B. The 2023 Proxy Defendants Caused Live Nation to Issue the Materially False or Misleading 2023 Proxy.**

245.   On April 28, 2023, Director Defendants Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Rapino, Walden, and Watkins (collectively with Officer Defendants Berchtold and Capo, the "2023 Proxy Defendants") caused Live Nation to file the 2023 Proxy Statement (the "2023 Proxy") in connection with the 2023 annual stockholders meeting to be held on June 9, 2023. In the 2023 Proxy, the 2023 Proxy Defendants solicited stockholders' votes to, among other things: (i) elect the eleven (11) director nominees, who were the eleven incumbent Director Defendants, to hold office until the 2023 Annual Meeting

of Stockholders, and (ii) approve executive compensation. With respect to these solicited votes, these Defendants issued materially false or misleading statements.

246.   The 2023 Proxy incorporated by reference the Company's 2022 Form 10-K (the "2022 10-K"), which was filed with the SEC on February 23, 2023 and signed by Defendants Rapino, Berchtold, Capo, Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Walden, and Watkins, as part of the materials that Live Nation stockholders relied upon to cast their votes at the Company's annual 2022 stockholder meeting. Notably, in the Securities Class Action, the court specifically found the following statement in the 2022 10-K was false and misleading when denying defendants' motion to dismiss. In this regard, the 2022 10-K falsely stated:

> Competition in the live entertainment industry is intense. We believe that we compete primarily on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences . . .
>
> We believe that barriers to entry into the promotion services business are low and that certain local promoters are increasingly expanding the geographic scope of their operations.
>
> We experience competition for other national, regional and local primary ticketing service providers to secure new venues and to reach fans for events.
>
> We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary

124

> ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that we understand have recently entered or could enter these markets.

247. In the Securities Class Action, the Court found this statement in the 2022 10-K to be false and misleading because the 2022 10-K failed to include specific facts and details about Live Nation's presence and control of the live entertainment industry. For example, the 2022 10-K omitted that Live Nation controls 60% of concert promotion services, and that competitors must have the ability to pay substantial up-front costs to actually compete in the market. These omissions made the Company's claims about an "intense[ly]" competitive market and success based predominantly "on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences" materially misleading because they created an impression of a state of affairs at Live Nation that differed in a material way from the one actually existing. As a consequence of the 2022 10-K's incorporation by reference into the 2023 Proxy, Live Nation's shareholders relied on false and misleading material information when casting their votes for the 2022 annual meeting.

248. Significantly, in the Securities Class Action, the court specifically found another statement in the 2022 10-K was false and misleading when denying defendants' motion to dismiss. In this regard, the 2022 10-K falsely stated:

125

All three of our segments had revenue growth in the year, with the largest increase coming from our Concerts segment as discussed below. Exceptionally strong demand for live events in the year led to record fan count and ticket sales, powering the concerts center of our business flywheel.

Our Concerts segment revenue grew by $8.8 billion, from $4.7 billion in 2021 to $13.5 billion in 2022. The revenue growth was a result of more shows and fans coming back to venues to enjoy their favorite artists.

Our Ticketing segment revenue grew by $1.1 billion, from $1.1 billion in 2021 to $2.2 billion in 2022. Ticketing AOI for the year increased by $407 million, from $421 million in 2021 to $828 million in 2022. Along with an increase in ticket sales, upward pricing momentum and revenue generated from non-service fee sources, while direct costs rose to support higher operations and enterprise growth. Our fee-bearing ticket sales for the year were a record breaking 281 million, over 50 million higher than our previous best year. Our resale business continued to grow, with nearly $4.5 billion dollars in gross transaction value for 2022, more than doubling resale gross transaction value in 2019. It was our highest resale year ever, powered by both Concerts and all the major sports leagues. . .This is a reflection of the quality of the Ticketmaster platform and its continued popularity with clients across the globe, giving us confidence that the Ticketmaster features and functionality will continue to fuel growth going forward.

249.   In the Securities Class Action, the Court found these statements in the 2022 10-K, which reflect the Company's assertion that 2022 revenue growth "is a reflection of the quality of the Ticketmaster platform and its continued popularity with clients across the globe," to be false and misleading because the 2022 10-K failed to include material information relevant to the Company's success, including

126

that Ticketmaster controls ticket distribution for over 70%of major concert venues in the U.S., as well as 77% of the top amphitheaters worldwide, and enters into long term exclusive dealing contracts with venues that may range to ten years or more in length. The court reasoned that without the additional explanation or context about the Company's control in the market, the 2022 10-K's statement that revenue growth was a reflection of the Ticketmaster platform and its popularity gave a reasonable investor the misleading impression of a state of affairs that differed in a material way from the one that actually exists at the Company.

250.   The 2023 Proxy also contained false and misleading statements that created the impression that Live Nation had internal controls and risk management systems to ensure the Company's compliance with antitrust laws, when it did not, resulting in the 2023 Proxy creating an impression of a state of affairs at Live Nation that differed in a material way from the one actually existing. For example, the 2023 Proxy represented in a section entitled "CORPORATE GOVERNANCE" that "[w]e are committed to maintaining high standards of business conduct and corporate governance, which we believe are essential to running our business efficiently, serving our stockholders well and maintaining our integrity in the marketplace." Similarly, in a section entitled "Supporting Ethics and Compliance," the 2023 Proxy stated that "We are actively engaging in efforts globally to ensure that ethics and compliance are embedded across our business . . . ."

251.   The 2023 Proxy described the Audit Committee's key role for the Board in risk oversight, including the Company's compliance with antitrust laws and its compensation policies and practices. The 2023 Proxy explained that "the Audit Committee's purpose is to assist the board of directors in its general oversight of the quality and integrity of our accounting, auditing and financial reporting and internal control practices." Specifically, the 2023 Proxy represented that the Board's Audit Committee "periodically reviews our policies and practices with respect to risk assessment and risk management, including discussing with management our major risk exposures and the steps that have been taken to monitor and control such exposures. The Audit Committee reports the results of its review to the board of directors." The 2023 Proxy also informed stockholders that "[t]he specific responsibilities of the Audit Committee include" "reporting regularly to the full board of directors regarding, among other things . . .compliance with legal or regulatory requirements," "discussing guidelines and policies with respect to risk assessment and risk management," and "oversight responsibility for areas such as . . . compliance with laws and regulations . . . ."

252.   The 2023 Proxy further represented that:

Matters of risk management are brought to the attention of the Audit Committee by our President and Chief Executive Officer, our President and Chief Financial Officer, our General Counsel, our Chief Accounting Officer, our external auditors and our Senior Vice President of Governance, Risk & Compliance, who regularly reviews and assesses internal processes and controls for ongoing compliance with internal policies, as well as for

128

potential weaknesses that could result in a failure of an internal control process. Management reviews and reports on potential areas of risk at the request of the Audit Committee or other members of the board of directors, including…compliance with laws and regulations...

We believe that our compensation policies and practices do not create inappropriate or unintended significant risk to the company as a whole. We also believe that our incentive compensation arrangements provide incentives that do not encourage risk-taking beyond the company's ability to effectively identify and manage significant risks, are compatible with effective internal controls and our risk management practices and are supported by the oversight and administration of the Compensation Committee with regard to executive compensation programs.

253.  In short, the 2023 Proxy falsely and misleadingly informed Live Nation's stockholders that the Board, with the Audit Committee having primary oversight, was actively working to mitigate significant risks to the Company, and ensure the Company's legal and regulatory compliance, including with U.S. antitrust law. The 2023 Proxy was materially false and misleading when made, because it, among other things, omitted any disclosures regarding Live Nation's anticompetitive business practices in the U.S., which exposed Live Nation to serious and significant regulatory and legal risks. The Proxy falsely and misleadingly omitted that Defendants had engaged in anticompetitive actions in violation of the 2010 Consent Decree, the Sherman Act and similar state antitrust laws, and how those violations, in part, resulted in the entry of the 2020 Amended Judgment and the filing of an antitrust consumer class action against the Company in 2022. Nor

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

did the 2023 Proxy disclose how Live Nation was under investigation by the DOJ and a Senate Subcommittee related to its anticompetitive actions.

254.   Indeed, by the time the 2023 Proxy was filed, Live Nation's pattern of engaging in anticompetitive actions, included: (i) acquiring or entering into joint ventures and other contractual agreements with potential competitors and nascent threats to neutralize any competition; (ii) threatening and intimidating, directly or through intermediaries, rivals, venues, and other potential threats, and otherwise pressuring them, to blunt expansion into U.S. concert promotions and protect and increase Ticketmaster's dominance; (iii) colluding with OVG to avoid competition in the concert promotions market; (iv) conditioning artists' access to Live Nation's large network of amphitheaters and other venues on choosing Live Nation as the promoter, which enables the Company to expand its control over artists and third-party venues; (v) using exclusive long-term contracts with venues; and (vi) using anticompetitive tactics to increase Live Nation's market share in the secondary ticketing market. Moreover, by this time, multiple media outlets had reported on the Company's unlawful anticompetitive activities, which were under investigation by the DOJ and a Senate committee. Consequently, the 2023 Proxy created a misleading impression of Live Nation's internal controls and risk management systems that differed in a material way from the ones actually existing at Live Nation.

255.   The 2023 Proxy further represented that the Compensation Committee also played a role in risk oversight of the Company's compensation policies and

130

practices. In this regard, the 2023 Proxy provided that the "specific responsibilities of the Compensation Committee include . . . overseeing the company's submissions to stockholders on executive compensation matters, including advisory votes on executive compensation and the frequency of such votes, incentive and other executive compensation plans and amendments to such plans;" and "overseeing and periodically assessing material risks associated with the company's compensation structure, policies and programs for executive officers" among others.

256. The 2023 Proxy explained to stockholders that the Company's executive compensation practices included a "[m]ajority of compensation 'at-risk' in a typical year."[70] The 2023 Proxy also represented that "Currently, we are primarily emphasizing, and the executive compensation program is designed primarily to reward, achievement of targeted Adjusted Operating Income . . ." The 2023 Proxy further stated that "*Compensation should align executives' interests with those of our stockholders.* Equity-based compensation encourages executives to focus on our long-term growth and prospects and to manage the company from the perspective of our stockholders," and "[b]y establishing common goals, we encourage a coordinated approach to managing the company that we believe will be most likely to increase stockholder value in the long term."

---

[70] 2023 Proxy at 33.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

257.   The 2023 Proxy stated that Live Nation "achieved 127% of our targeted company Adjusted Operating Income . . . for the year on a constant-currency and pro-forma basis. All of our named executive officers had their cash performance bonuses tied to that target, and as a result, all of them received at least 100% of their targeted cash performance bonuses." Specifically, the Officer Defendants received the following cash performance bonuses of $12,000,000 to Rapino; $2,600,000 to Berchtold; $212,500 to Capo; $981,725 to Hopmans; and $800,000 to Rowles.

258.   The statements in the 2023 Proxy related to executive compensation falsely and misleadingly conveyed that Live Nation's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In truth, Live Nation's compensation design incentivized the Officer Defendants' misconduct. In this regard, by engaging in anticompetitive actions, including failing to comply with the 2010 Consent Decree and then the 2020 Amended Judgment, and taking other anticompetitive actions in violation of the Sherman Act and similar state laws, the Company increased its profits, and thereby, significantly increased the Officer Defendants' "performance based" compensation. Consequently, the 2023 Proxy gives a reasonable investor the misleading impression of a state of affairs that differed in a material way from the one that actually existed at the Company related to the Company's compensation structures and their effect on long-term stockholder value, pay for performance, and good governance.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

259.  The 2023 Proxy Statement, including the 2022 10-K, harmed Live Nation by interfering with the proper governance on its behalf that follows its stockholders' informed voting of directors. As a result of the false or misleading statements in the 2023 Proxy Statement, Live Nation stockholders voted to re-elect the 2023 Proxy Defendants to the Board. Had Live Nation stockholders known the truth, they would not have re-elected Live Nation's ten incumbent directors and would have instead worked to elect directors who would have worked to prevent or mitigate the harm to the Company giving rise to this action.

260.  Under this false impression, numerous Live Nation stockholders voted in support of significant executive compensation, including to Defendants Rapino, Berchtold, Hopmans, Rowles, and Capo totaling over $16.5 million, respectively, in 2022 and causing damage to Live Nation.

## C. The 2024 Proxy Defendants Caused Live Nation to Issue the Materially False or Misleading 2024 Proxy.

261.  On April 29, 2024, Director Defendants Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Paul, Rapino, and Watkins (collectively with Officer Defendants Berchtold and Capo the "2024 Proxy Defendants") caused Live Nation to file the 2024 Proxy Statement (the "2024 Proxy") in connection with the 2024 annual stockholders meeting to be held on June 13, 2024. In the 2024 Proxy, the 2024 Proxy Defendants solicited stockholders' votes to, among other things: (i) elect the eleven (11) incumbent director nominees

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

to hold office until the 2024 Annual Meeting of Stockholders, (ii) adopt the Live

Nation Entertainment, Inc. 2005 Stock Incentive Plan, as amended and restated as

of March 21 2024, and (iii) approve executive compensation. With respect to these

solicited votes, these Defendants issued materially false or misleading statements.

262.   The 2024 Proxy incorporated by reference the Company's 2023 Form

10-K (the "2023 10-K"), which was filed with the SEC on February 22, 2024 and

signed by Defendants Rapino, Berchtold, Capo, Carter, Fu, Hinson, Hollingsworth,

Iovine, Kahan, Maffei, Mays, Paul, and Watkins, as part of the materials that Live

Nation stockholders relied upon to cast their votes at the Company's annual 2024

stockholder meeting. Notably, in the Securities Class Action, the court specifically

found statements in the 2021 10-K and 2022 10-K were false and misleading when

denying defendants' motion to dismiss, which are also included in the 2023 10-K.

In this regard, like the 2021 10-K and 2022 10-K, the 2023 10-K also falsely stated:

> Competition in the live entertainment industry is intense.
> We believe that we compete primarily on the basis of our
> ability to deliver quality music events, sell tickets and
> provide enhanced fan and artist experiences. . .
>
> We believe that barriers to entry into the promotion
> services business are low and that certain local promoters
> are increasingly expanding the geographic scope of their
> operations.
>
> We experience competition for other national, regional
> and local primary ticketing service providers to secure
> new venues and to reach fans for events.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

We also face significant and increasing competition from companies that sell self-ticketing systems, as well as from venues that choose to integrate self-ticketing systems into their existing operations or acquire primary ticketing service providers. Our competitors include primary ticketing companies such as Tickets.com, AXS, Paciolan, Inc., CTS Eventim AG, Eventbrite, eTix, SeatGeek, Ticketek, See Tickets and Dice; secondary ticketing companies such as StubHub, Vivid Seats, Viagogo and SeatGeek; and many others, including large technology and ecommerce companies that we understand have recently entered or could enter these markets.

263.    In the Securities Class Action, the Court found this statement in the 2021 10-K and 2022 10-K to be false and misleading because they failed to include specific facts and details about Live Nation's presence and control of the live entertainment industry. The 2023 10-K also failed to include those specific facts. For example, the 2023 10-K omitted that Live Nation controls 60% of concert promotion services, and that competitors must have the ability to pay substantial up-front costs to actually compete in the market. These omissions made the Company's claims about an "intense[ly]" competitive market and success based predominantly "on the basis of our ability to deliver quality music events, sell tickets and provide enhanced fan and artist experiences" materially misleading because they created an impression of a state of affairs at Live Nation that differed in a material way from the one actually existing. As a consequence of the 2023 10-K's incorporation by reference into the 2024 Proxy, Live Nation's shareholders relied on false and misleading material information when casting their votes for the 2024 annual meeting.

264.    The 2024 Proxy also contained false and misleading statements that created the impression that Live Nation had internal controls and risk management systems to ensure the Company's compliance with antitrust laws, when it did not, resulting in the 2024 Proxy creating a misleading impression of a state of affairs at Live Nation that differed in a material way from the one actually existing. For example, the 2024 Proxy represented in a section entitled "CORPORATE GOVERNANCE" that "[w]e are committed to maintaining high standards of business conduct and corporate governance, which we believe are essential to running our business efficiently, serving our stockholders well and maintaining our integrity in the marketplace." Similarly, in a section entitled "Supporting Ethics and Compliance," the 2024 Proxy stated that "As the global regulatory landscape continues to change, we are consistently tracking and updating our actions and policies to stay ahead of this cause in multiple aspects of our business . . . ."

265.    The 2024 Proxy explained the Audit Committee's key role for the Board in risk oversight, including the Company's compliance with U.S. antitrust laws and its compensation policies and practices. The 2024 Proxy explained that "the Audit Committee's purpose is to assist the board of directors in its general oversight of the quality and integrity of our accounting, auditing and financial reporting and internal control practices." The 2024 Proxy represented that the Board's Audit Committee "periodically reviews our policies and practices with respect to risk assessment and risk management, including discussing with

136

management our major risk exposures and the steps that have been taken to monitor and control such exposures. The Audit Committee reports the results of its review to the board of directors." The 2024 Proxy also informed stockholders of "[t]he specific responsibilities of the Audit Committee," which include "reporting regularly to the full board of directors regarding, among other things…compliance with legal or regulatory requirements," "discussing guidelines and policies with respect to risk assessment and risk management, including reviewing and discuss[ing] periodic reports from management pertaining to significant risk areas," and "oversight responsibility for areas such as . . . compliance with laws and regulations . . . ."

266.   The 2024 Proxy further represented that:

Matters of risk management are brought to the attention of the Audit Committee by our President and Chief Executive Officer, our President and Chief Financial Officer, our General Counsel, our Chief Accounting Officer, our external auditors and our Senior Vice President of Governance, Risk & Compliance. Our Senior Vice President of Governance, risk & Compliance regularly reviews and assesses internal processes and controls for ongoing compliance with internal policies, as well as for potential weaknesses that could result in a failure of an internal control process. Management reviews and reports on potential areas of risk at the request of the Audit Committee or other members of the board of directors, including…compliance with laws and regulations…

We believe that our compensation policies and practices do not create inappropriate or unintended significant risk to the company as a whole. We also believe that our incentive compensation arrangements provide incentives that do not encourage risk-taking beyond the company's ability to effectively identify and manage significant risks, are compatible with effective internal controls and our risk management

137

practices and are supported by the oversight and administration of the Compensation Committee with regard to executive compensation programs.

267.  In short, the 2024 Proxy falsely and misleadingly informed Live Nation's stockholders that the Board, with the Audit Committee having primary oversight, was actively working to mitigate significant risks to the Company, and ensure the Company's legal and regulatory compliance, including with U.S. antitrust laws. The 2024 Proxy was materially false and misleading when made, because it, among other things, omitted any disclosures regarding Live Nation's anticompetitive business practices in the U.S., which exposed Live Nation to serious and significant regulatory and legal risks. The Proxy falsely and misleadingly omitted that the Individual Defendants have engaged in anticompetitive actions in violation of the Sherman Act and similar state antitrust laws, and how those violations of the 2020 Amended Judgment and other antitrust laws in the U.S., resulted in the filing of the 2024 DOJ Action, a consumer class action, and a securities class action.

268.  Indeed, by the time the 2024 Proxy was filed, Live Nation's pattern of engaging in anticompetitive actions included: (i) acquiring or entering into joint ventures and other contractual agreements with potential competitors and nascent threats to neutralize any competition; (ii) threatening and intimidating, directly or through intermediaries, rivals, venues, and other potential threats, and otherwise pressuring them, to blunt expansion into U.S. concert promotions and protect and

138

increase Ticketmaster's dominance; (iii) colluding with OVG to avoid competition in the concert promotions market; (iv) conditioning artists' access to Live Nation's large network of amphitheaters and other venues on choosing Live Nation as the promoter, which enables the Company to expand its control over artists and third-party venues; (v) using exclusive long-term contracts with venues; and (vi) using anticompetitive tactics to increase Live Nation's market share in the secondary ticketing market. Moreover, by this time, multiple media outlets had reported on how the Company's anticompetitive activities had violated the 2020 Amended Judgment and other U.S. antitrust laws, and how the DOJ and many states were expected to file the 2024 DOJ Action. The 2024 Proxy, therefore, created a misleading impression of Live Nation's internal controls and risk management systems that differed in a material way from the ones actually existing at the Company.

269.   The 2024 Proxy further represented that the Compensation Committee also played a role in risk oversight of the Company's compensation policies and practices. In this regard, the 2024 Proxy provided that the "specific responsibilities of the Compensation Committee include. . . overseeing the company's submissions to stockholders on executive compensation matters, including advisory votes on executive compensation and the frequency of such votes, incentive and other executive compensation plans and amendments to such plans;" and "overseeing and

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

periodically assessing material risks associated with the company's compensation structure, policies and programs for executive officers;" among others.

270.    The 2024 Proxy stated that the Company's executive compensation practices included a "[m]ajority of compensation 'at-risk' in a typical year." The 2024 Proxy further stated, "Currently, we are primarily emphasizing, and the executive compensation program is designed primarily to reward, achievement of targeted Adjusted Operating Income." The 2024 Proxy also represented that *"Compensation should align executives' interests with those of our stockholders.* Equity-based compensation encourages executives to focus on our long-term growth and prospects and to manage the company from the perspective of our stockholders," and "[b]y establishing common goals, we encourage a coordinated approach to managing the company that we believe will be most likely to increase stockholder value in the long term."

271.    The 2024 Proxy stated that in 2023, Live Nation "achieved 120% of our targeted company Adjusted Operating Income . . . for the year on a constant-currency and pro-forma basis. All of our named executive officers had their cash performance bonuses tied to that target, and as a result, all of them received at least 100% of their targeted cash performance bonuses." Specifically, the Officer Defendants received the following cash performance bonuses of $18,700,000 to Rapino; $4,400,000 to Berchtold; $212,500 to Capo; $981,725 to Hopmans; and $1,650,000 to Rowles.

272.   The statements in the 2024 Proxy related to compensation falsely and misleadingly conveyed that Live Nation's compensation structures encouraged long-term stockholder value, pay for performance and good governance. In truth, Live Nation's compensation design incentivized the Officer Defendants' misconduct. In this regard, by engaging in anticompetitive actions, including failing to comply with the 2020 Amended Judgment and taking other anticompetitive actions in violation of the Sherman Act and similar state laws, the Company increased Live Nation's profits, and thereby, significantly increased the Officer Defendants' "performance based" compensation. Consequently, the 2023 Proxy gave a reasonable investor the misleading impression of a state of affairs that differed in a material way from the one actually existing at the Company related to the Company's compensation structures and their effect on long-term stockholder value, pay for performance, and good governance.

273.   The 2024 Proxy Statement harmed Live Nation by interfering with the proper governance on its behalf that follows its stockholders' informed voting of directors. As a result of the false or misleading statements in the 2024 Proxy Statement, Live Nation stockholders voted to re-elect the 2024 Proxy Defendants to the Board. Had Live Nation stockholders known the truth, they would not have re-elected Live Nation's eleven incumbent directors and would have instead worked to elect directors who would have worked to prevent or mitigate the harm to the Company giving rise to this action.

274.   Under this false impression, numerous Live Nation stockholders voted

in support of significant executive compensation, including to Defendants Rapino,

Berchtold, Hopmans, Rowles, and Capo totaling nearly $26 million, respectively, in

2023 and causing damage to Live Nation

## VI.   DEFENDANT RAPINO SOLD MORE THAN $250 MILLION IN LIVE NATION STOCK WHILE IN POSSESSION OF MATERIAL NONPUBLIC INFORMATION

275.   In just over half a year, from March 16, 2022 through September 23,

2022, while Live Nation repeatedly violated the antitrust laws in the U.S., along with

the 2020 Amended Judgment, Defendant Rapino, was motivated, in whole or in part,

by his knowledge of material nonpublic information ("MNPI") about the Company's

misconduct, including his own unlawful anticompetitive actions on the Company's

behalf, and the related DOJ investigation as described in Sections IV.E-I above.

Specifically, Rapino sold 2,594,719 shares of Live Nation common stock—

representing approximately *90.7%* of his holdings as of the beginning of that time

period—for gross proceeds of $267,431,851.50. According to Rapino's public

filings, eleven (11) of his sixteen (16) sales occurred pursuant to a Rule 10b5-1

trading plan.

| Transaction Date(s) | SEC Reporting Date | Number of Sale Transactions | Amount Shares of Company Common Stock Sold | Amount of Proceeds Received for Common Stock Sales | Further Details | |
|---|---|---|---|---|---|---|
| 3/16/22 — 3/18/22 | 3/18/22 | 17 | 234,000 | $25,987,539.03 | 10b5-1 trading plan | |

Redacted Verified Shareholder Derivative Action Complaint

| Transaction Date(s) | SEC Reporting Date | Number of Sale Transactions | Amount Shares of Company Common Stock Sold | Amount of Proceeds Received for Common Stock Sales | Further Details |
|---|---|---|---|---|---|
| 3/23/22 – 3/25/22 | 3/25/22 | 12 | 234,000 | $27,221,133.65 | 10b5-1 trading plan |
| 3/30/22 – 4/01/22 | 4/01/22 | 12 | 263,721 | $30,993,838.69 | 10b5-1 trading plan; one sale for taxes |
| 4/06/22 – 4/08/22 | 4/08/22 | 11 | 234,000 | $25,536,184.39 | 10b5-1 trading plan |
| 4/13/22 – 4/14/22 | 4/15/22 | 9 | 156,000 | $17,530,708.17 | 10b5-1 trading plan |
| 4/20/22 - 4/22/22 | 4/22/22 | 14 | 234,000 | $25,612,135.92 | 10b5-1 trading plan |
| 4/27/22 – 4/29/22 | 4/29/22 | 15 | 234,000 | $24,964,460.87 | 10b5-1 trading plan |
| 5/04/22 – 5/06/22 | 5/06/22 | 24 | 234,000 | $22,223,687.66 | 10b5-1 trading plan |
| 5/10/22 | 5/12/22 | 1 | 24,363 | $2,147,354.82 | for taxes |
| 5/24/22 | 5/26/22 | 1 | 5,529 | $466,924.05 | for taxes |
| 5/30/22 | 6/01/22 | 1 | 6,634 | $633,480.66 | for taxes |
| 7/26/22 | 7/28/22 | 1 | 6,266 | $562,561.48 | for taxes |
| 8/16/22 | 8/18/22 | 1 | 26,206 | $2,595,442.24 | for taxes |
| 9/07/22 – 9/09/22 | 9/09/22 | 7 | 234,000 | $21,372,937.74 | 10b5-1 trading plan |
| 9/14/22 – 9/16/22 | 9/16/22 | 10 | 234,000 | $21,177,460.84 | 10b5-1 trading plan |

143

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

| Transaction Date(s) | SEC Reporting Date | Number of Sale Transactions | Amount Shares of Company Common Stock Sold | Amount of Proceeds Received for Common Stock Sales | Further Details | |
|---|---|---|---|---|---|---|
| 9/21/22 – 9/23/22 | 9/23/22 | 12 | 234,000 | $18,406,001.29 | 10b5-1 trading plan | |
| Total | | | 2,594,719 | $267,431,851.50 | | |

276.  Approximately two months after Rapino finished his massive stock selling spree, on November 18, 2022, *The New York Times* reported that the DOJ was investigating Live Nation for antitrust violations.

## VII.  HARM TO LIVE NATION

277.  As a direct and proximate result of Defendants' actions, their conscious failure to perform their fiduciary duties in good faith, along with their violations of federal and state laws, Live Nation has sustained significant harm both financially and to its corporate image and goodwill.

278.  Live Nation's ongoing unlawful conduct has resulted in the extension and enhancement of an existing court-imposed final judgment related to the DOJ's antitrust investigation of its merger with Ticketmaster in 2010 (i.e., the 2010 Consent Decree), through at least the end of 2025 (i.e., the 2020 Amended Judgment). Live Nation's operations and finances will continue to be impacted because it remains subject to "certain restrictions and obligations" imposed by the 2020 Amended Judgment, including ongoing oversight from the DOJ.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

279.   Live Nation is also subject to certain agreements with several states and the FTC that govern, and in certain cases place limitations on, the Company's ticketing resale practices. The Company also was the subject of a now settled lawsuit suit brought by the Canadian Competition Bureau related to alleged deceptive marketing practices. Each of these actions has damaged Live Nation and its business.

280.   Defendants' misconduct has also resulted in constant and ongoing oversight by members of Congress. For years several Senators repeatedly urged the DOJ to investigate Live Nation for its anticompetitive activities in the ticketing markets, for not complying with the 2010 Consent Decree and later for not complying with the 2020 Amended Judgment. They have also sought detailed information on Live Nation's business practices including a hearing held by the Senate Judiciary Committee on Competition Policy, Antitrust, and Consumer Rights at which Live Nation testified.

281.   Damages incurred by Live Nation because of Defendants' misconduct include, and will include, operational cost increases, restrictions on operations including lost revenues, penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny, increased cost of capital, and other liabilities described herein.

282.   Specifically, the harm incurred to Live Nation includes, but is not limited to:

- A $20 million settlement of the Securities Action;

145

- Payments of millions of dollars in excessive bonuses to the Officer Defendants, whose compensation was inflated due to the Company's unlawful anticompetitive practices which increased Live Nation's profits and in turn, those officers' annual at risk compensation;

- Legal fees and expenses associated with the securities class action,

- various governmental investigations and actions brought by the DOJ and state AGs;

- Potential damages from litigation brought by the DOJ, thirty-nine states and the District of Columbia which could include civil penalties, treble damages and payment of attorneys' fees and expenses, along with the break-up of Live Nation and Ticketmaster;

- Costs associated with responding to Congressional and other regulatory investigations;

- Potential damages from consumer class action lawsuits pending in the United States and Canada; and

- Loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Defendants' false statements and lack of candor to the securities markets.

283.   Live Nation has suffered certain costs, including the DOJ's fees for prosecuting its investigation, and faces potential civil fines of $1 million for each violation of the 2020 Amended Judgment.

284.   Live Nation's business, goodwill, and reputation have been, and will continue to be, severely damaged by Defendants' decision to allow and/or failure to prevent the Company's violation of antitrust, consumer protection and unfair competition laws.

146

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

## VIII.  DUTIES OF DEFENDANTS

285.   Defendants' participation in, approval, and/or support of Live Nation's pursuit of unlawful anticompetitive business strategies to increase the Company's annual profits and in turn the Officer Defendants' at risk compensation, along with the failure to attend to red flags, breached their fiduciary duties under Delaware law as well as their duties as set forth in Live Nation's bylaws, governance guidelines, and Board committee charters.

### A. Fiduciary Duties Under Delaware Law.

286.   Under Delaware law, as Live Nation directors and/or officers, Defendants owe fiduciary duties of loyalty, good faith, and candor to the Company's shareholders. In this regard, Defendants have the ability to control the Company's business and corporate affairs, and thus, are required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner. Defendants were, and are, required to act in furtherance of the best interests of Live Nation and its stockholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

287.   By virtue of their fiduciary duties of loyalty, good faith, and candor, each Defendant was required to, among other things:

- Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements;

147

- When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

- Remain informed as to how the Company conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

288.   In particular, Defendants owed "oversight" duties (i.e., "Caremark" duties) as part of their fiduciary duties. Defendants' oversight duties required the directors and/or officers to take action when "red flags" of unlawful conduct concerning the Company's operations are waved in their face. Moreover, under Delaware law, a fiduciary cannot comply with his fiduciary duties in good faith if he is causing the Company to violate a positive law (i.e., a "Massey" claim).

**B. The Board, its Committees, and Officers Were Charged with Overseeing Live Nation's Legal Compliance, Risk Exposure, and Internal Controls.**

289.   Live Nation's certificate of incorporation, corporate governance guidelines, and Board committee charters specifically set forth the duties and obligations that Live Nation Board members and/or officers are required to fulfill on behalf of the Company with respect to overseeing compliance with regulations, along with its risk exposure, and internal controls. Defendants, who were and are members of the committees of the Board, assumed the responsibility to carry out the functions of their respective committees.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

### i. Duties Under the Company's Certificate of Incorporation.

290.    Live Nation's Amended and Restated Certificate of Incorporation, attached as an exhibit to the Form 10-K filed with the SEC on February 21, 2025, under Article III states that, "The purpose of the Corporation shall be to engage in any lawful act or activity for which corporations may be organized and incorporated under the General Corporation Law of the State of Delaware."

### ii.    Duties Under the Company's Code of Business Conduct and Ethics.

291.    Live Nation's Code of Business Conduct and Ethics applies to Defendants as directors and officers. Specifically, the Code of Business Conduct and Ethics states, "First and foremost, our policy is to behave in an ethical manner and comply with all laws, rules and government regulations that apply to our business regardless of location." The Code of Business Conduct and Ethics contains a section entitled, "Antitrust Laws," which explains:

292.    Antitrust laws are designed to ensure a fair and competitive marketplace by prohibiting various types of anti-competitive behavior. Some of the most serious antitrust offenses occur between competitors, such as agreements to fix prices or to divide customers, territories or markets. Accordingly, it is important to avoid discussions with our competitors regarding pricing, terms and conditions, costs, marketing plans, customers or any other proprietary or confidential information.

293.  Unlawful agreements need not be written. They can be based on informal discussions or the mere exchange of information with a competitor. If you believe that a conversation with a competitor enters an inappropriate area, end the conversation at once. Membership in trade associations (this does not include labor unions) is permissible only if approved in advance by your Legal Department.

294.  Most competition law issues surrounding your relationships with clients or suppliers involve ensuring that the Company is not foreclosing the opportunity of rivals to compete in the market, either by locking up customers or depriving them of needed supplies. It is perfectly appropriate for you to compete hard for customers and to win their business on the merits. Certain arrangements, however, can raise competition law issues depending on the circumstances. These include, but may not be limited to exclusive dealing arrangements, predatory pricing, and bundling.

### iii.    Duties of Audit Committee Members.

295.  According to its publicly available charter, the "[p]urpose" of the Audit Committee is to: "assist[] the Board in fulfilling its responsibility for oversight," among other things:

- the quality and integrity of …the Company's…systems of internal control, and

- the Company's compliance with legal and regulatory requirements

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

296.  To fulfill its purposes, the Audit Committee has a broad range of powers and obligations, including "the authority to conduct any investigation appropriate to fulfilling its responsibilities," and "the authority to retain, at the Company's cost and expense, special independent legal, accounting, or other advisors or experts it deems necessary in the performance of its duties."

297.  The Audit Committee Charter further requires the members to:

- Regularly report Committee activities to the full Board with such recommendations as the Committee may deem appropriate, including any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the independent auditors or the performance of the internal audit function.

- Discuss guidelines and policies with respect to risk assessment and risk management including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including legal and ethical compliance programs.

- Review periodically with management and the Chief Legal Officer the status of legal and regulatory matters that may have a material impact on the Company's financial statements and compliance policies.

- Receive any report by legal counsel regarding any evidence of a material violation of securities laws, breach of fiduciary duty or similar violation by the Company or its agents.

### iv.    Duties of Compensation Committee Members.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

298.   Live Nation's Compensation Committee "has been established to: (a) assist the Board in ensuring that a proper system of long-term and short-term compensation is in place to provide performance-oriented incentives to management, and that compensation plans are appropriate and competitive and properly reflect the objectives and performance of management and the Company; (b) review and approve corporate goals and objectives relevant to the compensation of the Company's Chief Executive Officer ("CEO"), evaluate the CEO's performance in light of those goals and objectives and, either as a committee or together with the other independent directors (as directed by the Board), determine and approve the CEO's compensation level based on this evaluation; (c) review and approve the material terms of non-CEO executive officer compensation, (d) administer and, as appropriate, make recommendations to the Board with respect to, incentive compensation plans and equity-based plans; (e) review and approve an annual report on executive officer compensation for inclusion in the Company's annual proxy statement . . ."

299.   The Compensation Committee's duties include, but are not limited to:

- To oversee the Company's submissions to stockholders on executive compensation matters, including advisory votes on executive compensation and the frequency of such votes, incentive and other executive compensation plans and amendments to such plans; and

- To oversee and periodically assess material risks associated with the Company's compensation structure, policies and programs for executive officers.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

## IX.    DEMAND FUTILITY

300.    Plaintiff has not made a pre-suit demand on the Board to assert the claims in this Complaint because such a demand would be futile and is therefore excused as a matter of law.

301.    As of the filing of this suit, Live Nation's Board consists of twelve (12) directors: Director Defendants Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Paul, Rapino, and Watkins, and non-parties, Richard Grenell, who joined the Board on May 19, 2025, and Carl Vogel, who joined the Board on June 12, 2025 ("Demand Board"). There is no disinterested and independent majority—i.e., at least six current directors—capable of impartially considering a demand as to any of the claims alleged in the Complaint.

302.    Defendant Rapino has served as Live Nation's President and CEO since 2005. Rapino is not considered independent under New York Stock Exchange Listing standards. Rapino faces personal liability for his violations of federal securities laws and breaches of fiduciary duties, including insider trading, as both an officer and a director. In addition, Rapino faces personal liability in a securities class action that involves some of the same subject matter as this lawsuit. Rapino is, thus, interested and cannot impartially consider a demand.

303.    In addition to Rapino, at least five other directors cannot impartially consider a demand as to any of the claims alleged in the Complaint.

### A. Demand Is Futile for Count I Concerning Violations of Section 14(a) of the Exchange Act.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

304.    Count I of the Complaint asserts derivative claims against the 2022, 2023, and 2024 Proxy Defendants (defined above) for violating Section 14(a) of the Exchange Act by issuing, causing to be issued, and participating in the issuance of the false and misleading 2022, 2023, and 2024 Proxies, respectively, in order to solicit Live Nation stockholders' votes to elect Live Nation directors, approve compensation, and vote on other matters at the respective annual stockholder meetings. Eleven of the Proxy Defendants are members of the Demand Board.

305.    Each of the currently serving Proxy Defendants served on the Board when they issued, caused to be issued, and participated in the issuance of materially false and misleading statements to stockholders which were contained in the 2022, 2023 and 2024 Proxies. In seeking the stockholders' votes for Live Nation's directors' and approval of executive compensation, among other issues, these Proxy Statements each falsely and misleadingly stated that Live Nation: (a) maintained high standards of business conduct and corporate governance; (b) the Company's directors and officers  adequately oversaw and maintained risk management policies and controls to ensure the Company's compliance with U.S. antitrust laws; and (c) had an executive compensation policy that deterred risk-taking and aligned with the Company's stockholders' interests. In addition, the Company's 2021, 2022, and 2023 10-Ks were incorporated by reference into the 2022, 2023, and 2024 Proxies, and they contained false and misleading information because they omitted material information about Live Nation's dominant position in the live entertainment market.

154

306.    Accordingly, there is not a majority of the Demand Board that can impartially consider a demand to pursue Count I against the 2022, 2023, or 2024 Proxy Defendants. Specifically:

(a)    nine of the twelve Demand Board members (Defendants Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Rapino, and Watkins) served on the Board when Live Nation filed the 2022 Proxy Statement and thus face a substantial likelihood of personal liability for violating Section 14(a) of the Exchange Act;

(b)    nine of the twelve Demand Board members (Defendants Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Rapino, and Watkins) served on the Board when Live Nation filed the 2023 Proxy Statement and thus face a substantial likelihood of personal liability for violating Section 14(a) of the Exchange Act; and

(c)    ten of the twelve Demand Board members (Defendants Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Maffei, Mays, Paul, Rapino, and Watkins) served on the Board when Live Nation filed the 2024 Proxy Statement and thus face a substantial likelihood of personal liability for violating Section 14(a) of the Exchange Act.

**B. Demand Is Futile for Count II Concerning Breaches of Fiduciary Duty Alleged Against the Director Defendants.**

307.    Count II of the Complaint asserts claims against the Director Defendants for breaching their fiduciary duties to Live Nation and its stockholders by participating in, authorizing, and permitting the Company to pursue unlawful anticompetitive business strategies, as well as ignoring red flags related to the Company's repeated violations of federal and state antitrust laws.

155

308.    Article III of Live Nation's operative, amended, and restated Certificate of Incorporation provides that the "purpose of the Corporation" is to "engage in any lawful act or activity for which corporations may be organized and incorporated under the General Corporation Law of the State of Delaware." Delaware law prohibits fiduciaries from operating a corporation illegally, even for profit.

309.    Delaware law allows stockholders to bring derivative claims against fiduciaries who knowingly cause the corporation to take unlawful actions that result in harm. A knowing violation of law cannot be exculpated pursuant to *8 Del. C.* § 102(b)(7). A breach of loyalty claim against directors for such conduct exposes those directors to substantial liability, rendering demand futile.

### 1.  A Majority of the Board Faces Substantial Liability for its Misconduct.

310.    There is no majority of the Demand Board that could impartially consider a demand to bring a claim of breach of fiduciary duty because ten (10) of the twelve (12) current directors face a substantial likelihood of liability for participating in, authorizing, and permitting the Company to pursue unlawful anticompetitive business strategies, as well as ignoring red flags related to the Company's repeated violations of federal and state antitrust laws. Because antitrust compliance is a central concern of Live Nation, and Live Nation is currently facing multiple lawsuits concerning the Company's violation of U.S. antitrust laws, these

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

1  directors cannot be expected to impartially investigate and bring claims against

2  themselves.

3

4      311.    Specifically, Defendants Carter, Fu, Hinson, Hollingsworth, Iovine,

5  Kahan, Mays, Paul, Rapino, and Watkins participated in, authorized, and permitted

6  the Company to pursue unlawful anticompetitive business strategies, as well as

7  ignoring red flags related to the Company's repeated violations of federal and state

8  antitrust laws, to increase its profits and in turn the Officer Defendants' lucrative at

9  risk compensation.

10

11      312.



157

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



313.

314.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



315.

159

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT



316.   Live Nation's unlawful anticompetitive practices were also publicized by national newspapers, subject to consent decrees and Senate scrutiny. As such, Defendants knew or should have been aware of that wrongful conduct through these public red flags, which also should have put them on notice of the DOJ's continued investigation of the Company's anticompetitive activities. Instead, the Board further ignored the following red flags concerning the Company's engagement in

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

anticompetitive actions in violation of U.S. antitrust laws, allowing Live Nation to continue its unlawful business strategies:

- The 2010 Consent Decree;

- *The New York Times* article dated April 1, 2018 concerning the DOJ's investigation of the Company's violations of antitrust laws;

- *The Guardian* article dated August 27, 2018 concerning Live Nation's engagement in anticompetitive actions;

- The CBC series from September 18-19, 2018 concerning Live Nation's unlawful secondary ticketing market practices;

- December 15, 2019 *Hollywood Reporter* reports that DOJ was investigating Live Nation's anticompetitive acquisition strategy;

- The 2020 Amended Judgment;

- *The New York Times* article dated November 18, 2022 concerning the DOJ's investigation of the Company's violations of antitrust laws;

- Announcement of Senate committee investigation concerning the Company's violation of antitrust laws;

- The January 24, 2023 Senate Committee hearing, where Defendant Berchtold testified; and

- The July 28, 2023 *Politico* article concerning DOJ filing a lawsuit against Live Nation concerning its unlawful anticompetitive practices.

317. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

161

[Text redacted]

## 2. A Majority of the Board Members Lack Independence from Each Other.

318.    In addition to demand being futile because a majority of the Demand Board faces a substantial likelihood of liability for breaching their fiduciary duties related to the Company's failure to comply with U.S. antitrust laws, demand is further excused for Count II because a majority of the Demand Board members lack independence from one another. As explained above, Rapino is considered not

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

independent. In addition, non-party Vogel and Defendants Hollingsworth, Carter, Iovine, Hinson, and Paul lack independence as further explained below.

### a. Hollingsworth and Vogel Are Not Independent Due to Their Liberty Media Ties.

319.    Demand is also futile as to Director Defendants Hollingsworth and non-party Vogel because they are not independent.

320.    As Live Nation explains in its 2025 Proxy Statement, Liberty Media is the Company's largest stockholder, owning 69,645,033 shares of Live Nation common stock as of April 25, 2025. As discussed above, Liberty Media is entitled, under the Liberty Stockholder Agreement, "to nominate up to two Liberty directors for election to [the Live Nation] board of directors." Those two directors are Hollingsworth and Vogel.

321.    Live Nation maintains that Hollingsworth is an independent director, but this is incorrect. Hollingsworth has worked at Liberty Media since 2007 and is currently the company's Senior Vice President for Corporate Strategy, a position he has held since 2024. From 2016 to 2024, Hollingsworth was Senior Vice President for Corporate Development at Liberty Media.

322.    Hollingsworth's employment with Liberty Media precludes him from being fully independent. Liberty Media holds approximately 30% of Live Nation, and therefore has a significant interest in Live Nation's continued growth. Additionally, under the Liberty Media Stockholder Agreement, Liberty has the right

to directly or indirectly acquire (subject to certain exceptions), by means of a purchase, tender or exchange offer, business combination or otherwise, beneficial ownership of Live Nation equity securities up to 35% of the total voting power of all Live Nation equity securities. Live Nation agreed not to take certain actions that would materially adversely affect Liberty's ability to acquire Live Nation equity securities up to 35% of the total voting power or would otherwise impose material economic burdens on Liberty's ability to do so. Accordingly, Liberty has the right to increase its stake in Live Nation even further, which would only increase the Liberty directors' incentive to push Live Nation to grow and obtain higher profits by any means necessary.

323.   Hollingsworth's role as a Senior Vice President for Corporate Strategy at Liberty Media deepens his conflict. At Liberty, Hollingsworth "focuses on strategic growth initiatives within the Liberty portfolio, as well as supporting the generation and execution of investment opportunities within the sports and live entertainment sectors." In other words, Hollingsworth's role as Senior Vice President is squarely concerned with the success and growth of Live Nation, a member of the "Liberty portfolio," in order to benefit Liberty. This presents a clear conflict of interest and makes demand on Hollingsworth futile because his primary employer—and his particular job there—benefit from Live Nation engaging in anticompetitive business practices. He cannot, then, disinterestedly and

independently decide whether to initiate and prosecute a lawsuit challenging those practices.

324.   According to the 2025 Proxy, Vogel "worked as an executive officer in various capacities for companies affiliated with Liberty Media" before 2001. Since 2001, he has held executive positions in other Liberty-affiliated companies, including serving as CEO of Charter Communications, Inc. from 2001-2005, Vice Chair and Senior Advisor of EchoStar Communications Corporation from 2007 to 2009, and President or Vice Chair of Dish Network Corporation from 2005 to 2009. These companies, at various points, have either been controlled or otherwise affiliated with Liberty or its major shareholder, John Malone. Vogel's long employment history with Liberty affiliates thus means he lacks independence in the same way that Hollingsworth lacks independence.

### b. Carter, Iovine, Paul, and Hinson Are Not Independent Because of Their Personal Conflicts.

325.   Demand is futile as to Director Defendants and Demand Board members Carter, Iovine, Paul, and Hinson because their personal conflicts preclude a finding that they are independent directors.

326.   Carter lacks independence because he has longstanding personal relationships with Rapino, an interested director, as well as with Iovine and Paul, who face a substantial likelihood of personal liability. ██████████████

█████████████████████████████████████████████████████████

[REDACTED]

327.    Carter's friendship with Paul is particularly significant, as it has spanned over 20 years and multiple business partnerships. Carter and Paul are two of the three top business associates of and close friends to basketball player and entrepreneur LeBron James. In 2005, after James fired his first agent, Carter, Paul, and James co-founded with Randy Mims LRMR Marketing, an agency and sports-marketing company—named after their first initials—to represent James and run his business portfolio. Carter is a minority partner in Klutch, Paul's talent agency, and Paul is a minority partner in the SpringHill Company, a production company that Carter started with James. Carter and Paul's business and personal relationships are too significant for either of them to be able to evaluate independently a litigation demand against the other.

328.    Carter also has significant business ties with Iovine. LRMR Ventures, the venture company that Carter co-founded with James and for which he serves as CEO, invested in Beats by Dre, a company Iovine co-founded and ran before selling it to Apple. Carter also sits on the board of Flipper's World, or Flipper's Roller Boogie Palace, a company that Iovine's wife's co-founded and that Iovine advises. The company operates a reimagined version of Flipper's Roller Boogie Palace, a

roller disco that Iovine's wife's father opened in 1979 that became a popular celebrity hangout and performance space. The personal nature of the project for Iovine and his wife underscores the personal relationship between Carter and Iovine, as well as between Iovine and Rapino, who also sits on the Flipper's board.

329.    Iovine also has a personal relationship with Paul; for example, Paul attended an art auction at Iovine's home that supported a charity project by Iovine and his frequent collaborator Andre Young (Dr. Dre).

330.    Iovine also has business ties with Live Nation beyond his membership on the Company's Board. He owns over 10 percent of NTWRK, a "livestream shopping platform" co-founded by his son, Jamie Iovine, and sits on NTWRK's board of directors. Live Nation has also invested in NTWRK and leases office space to the company. This conflict of interest prevents Iovine from being able to independently and disinterestedly determine whether to initiate and prosecute claims related to Live Nation's anticompetitive business practices because he benefited financially from those practices.

331.    Hinson is also conflicted because of his financial entanglement with Live Nation outside of his responsibilities as a director. Hinson has been involved with multiple companies that have done or sought business with Live Nation, including ParkHub (director), Sourced Craft Cocktails (investor and board member), AiBuy (consultant and has a "small option agreement"), Craft Standard (director and Chairman), and Ecliptic Capital, which has an ownership interest in Sourced Craft

167

Cocktails (advisor "with a small interest in their fund"). Accordingly, demand is futile as to Hinson.

### C. Demand Is Futile for Count III Concerning Breaches of Fiduciary Duty Alleged Against the Officer Defendants.

332.   Count III alleges breaches of fiduciary duty against the Officer Defendants for consciously breaching their fiduciary duties in at least the following ways: (a) maintaining, overseeing, and/or implementing business strategies that relied on unlawful, anticompetitive business practices that involved threatening and/or colluding with rivals and potential competitors, conditioning access to its venues to artists hiring its promotion services, acquiring potential competitors, even those that competed only at the margins, coercing venues into using Ticketmaster for primary ticketing, and locking venues into long-term exclusive contracts, among others; (b) repeatedly failing to implement and actively monitor or oversee a program to ensure compliance with federal and state antitrust laws, as well as with the 2020 Amended Judgment; and (c) disregarding their duty to investigate red flags and to remedy any misconduct uncovered.

333.   Rapino, as Live Nation's President, CEO, and a member of the Board of Directors, faces a substantial likelihood of personal liability for breaching his fiduciary duties as both an officer and a director, and therefore is unable to impartially consider a demand to pursue Count III against himself or the other Officer Defendants.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

334.   Many of the factual allegations and legal arguments underlying Count III also underlie other Counts of the Complaint. Proving Count III would require pursuing allegations that would tend to put the remaining directors at increased risk of personal liability on other counts. The nine other Demand Board Defendants (Carter, Fu, Hinson, Hollingsworth, Iovine, Kahan, Mays, Paul, and Watkins) are thus incapable of impartially considering Count III, and demand is therefore excused.

335.   Furthermore, the additional reasons discussed as to Count II that demand is futile against the Demand Board—that the Board faces substantial liability for its misconduct, Vogel and Hollingsworth are not independent, and Carter, Iovine, Paul, and Hinson are not independent because of their personal conflicts—likewise apply to Count III. Accordingly, demand is excused as futile.

**D. Demand Is Futile for Count IV Concerning Insider Trading.**

336.   Count IV alleges breach of fiduciary duties related to insider trading claims against Defendant Rapino, who knew about the material nonpublic information described in this Complaint regarding Live Nation's unlawful anticompetitive business operations and the DOJ's related investigation and sold or otherwise disposed of Live Nation's common stock on the basis of that information. For the same reasons that a majority of the Demand Board cannot impartially consider a demand to pursue Counts I, II, and III, neither can they consider a demand to pursue Count IV.

169

## X.    CLAIMS FOR RELIEF
### COUNT I
### Violation of Section 14(a) of the Exchange Act
### <u>Against the Proxy Defendants</u>

337.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein, except this claim may be alleged on a negligence standard as further described below. Further, this count is asserted as a derivative claim on behalf of the Company by Plaintiff, and not as a direct claim on behalf of shareholders.

338.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false and misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

339.    17 C.F.R. § 240.14a-9(a).

340.    The Director Defendants either knowingly or negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy. The 2022 Proxy, the 2023 Proxy, and the 2024 Proxy contained proposals to Live Nation's stockholders urging them to re-elect the

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

members of the Board. The 2023 Proxy further urged Live Nation's stockholders to approve an advisory vote on executive compensation. The 2024 Proxy also asked Live Nation's stockholders to approve the Live Nation Entertainment, Inc. 2005 Stock Incentive Plan, as amended and restated as of March 21, 2024, which increased the number of shares that the Compensation Committee was permitted to use as "incentive award[] as part of Live Nation's overall compensation program," among other amendments. These Proxies made false and misleading statements concerning the Audit Committee's key role in the Board's oversight of mitigating significant risks to the Company, while ensuring the Company's legal and regulatory compliance. In this regard, the Proxies omitted material information regarding Live Nation's anticompetitive actions that exposed it to serious and significant regulatory and legal risks. The Proxies also contained false and misleading statements conveying that Live Nation's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In truth, Live Nation's compensation design incentivized the Officer Defendants' misconduct to engage in anticompetitive actions in violation of U.S. antitrust laws and the consent decrees because a majority of the executives' annual compensation was "at risk". Those false and misleading proxies further caused significant harm to Live Nation when its stockholders re-elected the Director Defendants, who continued to participate in the Company's wrongful anticompetitive conduct, and therefore, those claims are properly brought as derivative claims.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

341.   By reasons of the conduct alleged in this Complaint, the Proxy Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of the Proxy Defendants' wrongful conduct, Live Nation misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Live Nation's recommendation to re-elect those directors and approve certain executive compensation.

342.   The misleading information contained in the 2022 Proxy, the 2023 Proxy, and the 2024 Proxy was material to Live Nation's stockholders in determining whether or not to elect the Director Defendants and approve certain executive compensation. The proxy-solicitation process in connection with the Proxies was an essential link in and proximate cause of the re-election of nominees to the Board and, in 2024, the approval of executive compensation and the amended Stock Incentive Plan.

343.   Plaintiff, on behalf of Live Nation, seeks relief for damages inflicted on the Company based on the misleading 2022, 2023, and 2024 Proxies in connection with the improper re-election of the members of the Board and approval of executive compensation.

344.   This action was timely commenced within three years of the date of each Proxy and within one year from the time that Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

## COUNT II
### Breach of Fiduciary Duty
### <u>Against the Director Defendants</u>

345.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

346.   The Director Defendants each owe (and owed) Live Nation and its stockholders fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's affairs.

347.   The Director Defendants breached their fiduciary duties by either approving, endorsing, facilitating, or failing to stop Live Nation's executives from employing unlawful, anticompetitive business strategies.

348.   The Director Defendants consciously breached their fiduciary duties in at least the following ways:

- Maintaining, overseeing, and/or implementing a business strategy that relied on unlawful, anticompetitive business practices that involved threatening and/or colluding with rivals and potential competitors, conditioning access to its venues to artists hiring its promotion services, acquiring potential competitors, even those that competed only at the margins, and locking venues into long-term, exclusive contracts, among others;

- Repeatedly failing to implement and actively monitor or oversee a program to ensure compliance with federal and state antitrust laws, as well as with the 2020 Amended Judgment; and

- Disregarding their duty to investigate red flags and to remedy any misconduct uncovered.

173

349.    The Director Defendants' actions as detailed in this Complaint were in bad faith and violated their duty of loyalty to the Company. The Director Defendants knew or should have known that such actions exposed Live Nation to significant liability.

350.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary duties, Live Nation has been damaged, not only monetarily, but also as to its corporate image and goodwill.

351.    Plaintiff, on behalf of Live Nation, has no adequate remedy at law.

**COUNT III**
**Breach of Fiduciary Duty**
**Against the Officer Defendants**

352.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

353.    The Officer Defendants each owe (and owed) Live Nation and its shareholders fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's affairs.

354.    The Officer Defendants breached their fiduciary duties by either approving, endorsing, facilitating, or failing to stop Live Nation from employing unlawful, anticompetitive business strategies.

355.    The Officer Defendants consciously breached their fiduciary duties in at least the following ways:

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

356.    Maintaining, overseeing, and/or implementing a business strategy that relied on unlawful, anticompetitive business practices that involved threatening and/or colluding with rivals and potential competitors, conditioning access to its venues to artists hiring its promotion services, acquiring potential competitors, even those that competed only at the margins, and locking venues into long-term, exclusive contracts, among others;

357.    Repeatedly failing to implement and actively monitor or oversee a program to ensure compliance with federal and state antitrust laws, as well as with the 2020 Amended Judgment; and

358.    Disregarding their duty to investigate red flags and to remedy any misconduct uncovered.

359.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary duties, Live Nation has been damaged, not only monetarily, but also as to its corporate image and goodwill.

360.    Plaintiff, on behalf of Live Nation, has no adequate remedy at law.

**COUNT IV**
***Brophy* Claim**
**<u>Against Defendant Rapino</u>**

361.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

362.    As a director and officer of Live Nation, Rapino owed and owes fiduciary duties to Live Nation and its stockholders. By reason of this fiduciary

175

relationship, Rapino specifically owed and owes Live Nation the highest obligation of good faith, fair dealing, loyalty, and due care when taking any actions motivated by the Company's material nonpublic information. In addition, Live Nation's exculpation provision in its Articles of Incorporation is inapplicable to the breach of fiduciary duty claims for insider selling alleged against officers, as charged in this claim.

363.    At the time of the stock sales set forth above, Rapino knew about the material nonpublic information described in this Complaint regarding Live Nation's business operations and sold or otherwise disposed of Live Nation's common stock on the basis of that information, using that information for his own benefit and to the detriment of the Company.

364.    Rapino's sales of Live Nation common stock while in possession and control of this material nonpublic information was a breach of his fiduciary duties of loyalty and good faith.

365.    Because the use of material nonpublic information for his own gain constitutes a breach of Rapino's fiduciary duties, the Company is entitled to damages.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Live Nation and that Plaintiff is a proper and adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties of loyalty to Live Nation;

C.    Determining and awarding to Live Nation the damages sustained by it, as a result of the breaches of fiduciary duty and other claims set forth above from each of the Individual Defendants, jointly and severally;

D.    Awarding to Live Nation restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by them. Including all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful conduct, payment of incentive compensation (whether in the form of cash bonuses, stock awards, or stock option grants), and common stock sale proceeds;

E.    Directing Live Nation to take all necessary actions to reform and improve its corporate governance and internal procedures, to enable the Company to comply with the Company's existing governance obligations and all applicable laws, and to protect the Company and its stockholders from a recurrence of the damaging events described herein, including, but not limited to, the following specific relief:

(i)    Strengthen the Board's supervision of operations and develop and implement procedures for greater shareholders input into the policies and guidelines for the Board;

177

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

(ii)    A Board committee of independent directors to oversee compliance, particularly of antitrust laws;

(iii)    Reform of Live Nation's anticompetitive practices with respect to all issues complained of herein;

(iv)    Strengthen internal controls concerning antitrust laws;

(v)    Strengthen the roles of the independent members of the Board in directing and overseeing the Company's operations; and

(vi)    Permit the shareholders of Live Nation to nominate at least three candidates for election to the Board.

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

G.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants, and experts' fees;

H.    Awarding pre- and post-judgment interest; and

I.    Granting such other and further relief as the Court deems just and equitable.

## XII.    JURY DEMAND

Plaintiff demands trial by jury.

Dated: June 18, 2025              **STREAM KIM HICKS WRAGE & ALFARO, PC**

                                  */s/* Eugene Kim
                                  Eugene Kim (SBN 221753)
                                  Eugene.kim@stream.kim.com

REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

1   Theodore Stream (SBN 138160)
2   Ted.stream@streamkim.com
3   3403 Tenth Street, Suite 700
    Riverside, California 92501
4   Telephone: (951) 783-9470

5   *Local Counsel for Plaintiff Iron Workers*
6   *Local No. 55 Pension Fund*

7   Maxwell R. Huffman (SBN 264687)
8   **SCOTT+SCOTT**
    **ATTORNEYS AT LAW LLP**
9   600 W. Broadway, Suite 3300
10  San Diego, CA 92101
    Telephone: 619-233-4565
11  Email: mhuffman@scott-scott.com

12
    Geoffrey M. Johnson (*pro hac vice*
13  *forthcoming*)
14  **SCOTT+SCOTT**
    **ATTORNEYS AT LAW LLP**
15  12434 Cedar Road, Suite 12
16  Cleveland Heights, OH 44106
    Telephone: 216-229-6088
17  Email: gjohnson@scott-scott.com

18
    Donald A. Broggi (*pro hac vice*
19  *forthcoming*)
20  Jing-Li Yu (SBN 342985)
    **SCOTT+SCOTT**
21  **ATTORNEYS AT LAW LLP**
22  The Helmsley Building
    230 Park Ave, 24th Floor
23  New York, NY 10169
    Telephone: 212-223-6444
24  Email: dbroggi@scott-scott.com
25          jyu@scott-scott.com

26
    Justin O. Reliford (*pro hac vice*
27  *forthcoming*)
28  **SCOTT+SCOTT**

179
REDACTED VERIFIED SHAREHOLDER DERIVATIVE ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTORNEYS AT LAW LLP**
222 Delaware Avenue, Suite 1050
Wilmington, DE 19801
Telephone: 302-578-7345
Email: jreliford@scott-scott.com

*Counsel for Plaintiff Iron Workers Local No. 55 Pension Fund*

Lyndsey K. Bates
**ASHERKELLY, PLLC**
**ATTORNEYS AT LAW**
25800 Northwestern Highway, Suite 1100
Southfield, MI 48075
Telephone: (248) 746-2753
Email: lbates@asherkellylaw.com

*Additional Counsel for Plaintiff Iron Workers Local No. 55 Pension Fund*

180